Patty R. SMITH et al., Plaintiffs-
Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 71–1331.

United States Court of Appeals,
Sixth Circuit.

May 11, 1972.

H. Stennis Little, Jr., Nashville,
Tenn., for plaintiffs-appellants.

· Daniel B. Rosenbaum, Tax Division, Department of Justice, Washington, D. C., Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks, Ernest J. Brown, Attys., Tax Division, Department of Justice, Washington, D. C., on brief; Charles H. Anderson, U. S. Atty., Nashville, Tenn., of counsel, for defendant-appellee.

Before CELEBREZZE, McCREE, and MILLER, Circuit Judges.

McCREE, Circuit Judge.

Appellants are taxpayers who appeal from a judgment of the District Court upholding the Commissioner's determination that lump-sum payments to each of them of their respective interests in their employer's profit-sharing plan were taxable as ordinary income. The plan was funded by contributions to a trust which was tax-exempt under the provisions of the Internal Revenue Code of 1939 and under section 501(a) of the Internal Revenue Code of 1954, 26 U.S. C. § 501(a).[1] It was adopted by appellants' employer, Adkins Cargo Express, Inc. (Cargo), when that company acquired and liquidated appellants' former employer in 1964.

The distributions which are the subject of this appeal followed the purchase of all of Cargo's stock by Gateway Transportation Company, Inc. (Gateway), on June 30, 1965. On July 14, 1965, Cargo's new board of directors, which had been elected by Gateway, resolved to discontinue and terminate the plan and trust. On December 29, 1965, the plan's trustee issued a check to each entitled participant in the plan in full settlement of his interest.

For tax and business reasons unrelated to the issues in this appeal, Cargo was maintained as a wholly owned subsidiary of Gateway until July 17, 1968, when it was merged into Gateway pursuant to a September 14, 1967, resolution of the corporations' boards of directors. Appellants Patty R. Smith and Mildred P. Chastain remained as employees of Cargo after the stock acquisition by Gateway and the distribution of the trust fund, but the employment of appellant John H. Kaiser was terminated on September 30, 1965, as a result of a decision to move the company's accounting operation from Nashville, Tennessee, to La Crosse, Wisconsin.[2] Taxpayers reported the amounts they received in distribution as capital gains, but the Commissioner, contending they had received ordinary income, made deficiency assessments. Thereafter, taxpayers paid the income tax and, after their claims were disallowed, brought this action to recover taxes aggregating $5,718.62. They assert that they were entitled by section 402(a) (2) of the Internal Revenue Code of 1954, 26 U.S.C. § 402(a) (2),[3] to treat the distributions, in excess of amounts which they as employees contributed, as gains from the sale or exchange of capital assets held for more than six months.[4]

---

1. Under 26 U.S.C. § 501(a), a trust is exempt from tax if it is a qualified trust under 26 U.S.C. § 401(a).

2. Patty R. Smith, Mildred P. Chastain and John H. Kaiser were, at relevant times, employed by Adkins Cargo Express, Inc. Wilson N. Chastain and Bernice J. Kaiser are parties because they filed joint income tax returns with their respective spouses.

3. Section 402(a) (2) provides, in pertinent part:
 . . . if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the

death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months . . . .

4. Gateway's board of directors and officers were elected as the board of directors and officers of Cargo in February 1965 and replaced the prior incumbents. When the profit-sharing fund was subsequently dis-

The parties agree that to qualify for capital gains taxation under this section, a payment from a qualified trust must: (a) be the total distribution payable with respect to the employee; (b) be paid to the distributee within one taxable year of the distributee; and (c) be made on account of the employee's separation from the service. It is also agreed that the first two requirements have been met and that we need to determine only whether the distributions were made on account of the employees' separation from the service within the meaning of section 402(a) (2). We conclude that appellants were entitled to the benefit of capital gains treatment of the amounts received.

The decided cases and revenue rulings which discuss this issue have been accurately described as having a "bramble bush character."[5] Accordingly, in applying them to the facts of this case it is helpful to review the history of capital gains provisions for this type of distribution.

The Internal Revenue Code of 1939, as enacted, made no provision for capital gains treatment of amounts paid from employee trusts. Employee participants in funded retirement plans were subject to a sudden "bunched-income" tax depletion of their retirement funds if they should receive a lump-sum distribution of their interest in a fund. In 1942, section 165(b) of the Code was amended to provide capital gains treatment of lump-sum payments made from employees' trusts on account of the distributees' "separation from the service."[6] The report of the Senate Finance Committee merely stated that the provision was to be applied when " . . . the total distributions to which an employee is entitled are paid to the employee in the year in which he retires or severs his connection with his employer . . . ." S.Rep.No.1631, 77th Cong., 2d Sess. (1942), in 1942 C.B. 504, 607.

The first two Tax Court decisions which interpreted the statute did little more than reiterate that the payment must be made on account of the employee's separation from the service of his employer. In E. J. Glinske, 17 T.C. 562 (1951), the taxpayer's employer sold all its assets and discontinued business. The purchaser of the assets continued the taxpayer's employment, but three weeks after the purchase it discontinued the pension plan which had been maintained by the taxpayer's employer and distributed the funds from the trust. The court, denying capital gains treatment, stated that " 'on account of the employee's separation from the service' means that the distributions were made on account of the employee's separation from the service of *his employer*." 17 T.C. at 565.[7] In Estate of Fry, 19 T.C.

---

tributed, Cargo's former president was able to treat his share as capital gains under section 402(a) (2).

5. Tannenwald, J., concurring in Victor S. Gittens, 49 T.C. 419, 429 (1968).

6. The amendment was enacted as § 162 (a) of the Revenue Act of 1942, 56 Stat. 862. It provided:

§ 165 . . . (b) . . . if the total distributions payable with respect to any employee are paid to the distributee within one taxable year of the distributee on account of the employee's separation from the service, the amount of such distribution to the extent exceeding the amount contributed by the employee, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months.

It has been asserted that this provision originated as an error in judgment on the Treasury's part in 1942 when it acquiesced to capital gains treatment as a solution to the bunched-income problem in this area. Surrey, The Congress and the Tax Lobbyist—How Special Tax Provisions Get Enacted, 70 Harv.L.Rev. 1145, 1161–1162 (1957). The provision has also been criticized as overly generous since other recipients of bunched income are accorded less generous relief. See United States v. Johnson, 331 F.2d 943, 954 n. 16 (5th Cir. 1964), and authorities cited therein.

7. This case has been cited for the proposition that distributions solely on account of the termination of a plan are not within § 402(a) (2). *E. g.*, Robbins, Effect of Corporate Reorganizations on Pension

461 (1952), aff'd, 205 F.2d 517 (3d Cir. 1953) (per curiam), the lump-sum payment was made to Fry when he reached retirement age, despite the fact that he continued to receive his regular compensation and continued to perform some services for his employer. The Tax Court concluded that the payment was not made on account of his separation from the service since he had not "severe[d] his connection with his employer within the year in which he received the lump-sum settlement of his rights." 19 T.C. at 464.

Then in Mary Miller, 22 T.C. 293 (1954), aff'd, 226 F.2d 618 (6th Cir. 1955) (per curiam), and in Lester B. Martin, 26 T.C. 100 (1956), the Tax Court held that a lump-sum distribution incident to the liquidation and dissolution of the taxpayer's corporate employer and the termination of its retirement fund qualified for capital gains treatment. The fact that the taxpayers in each case were employed by the successor company did not prevent the transaction from being a "separation from the service" of their former employers.

In Mary Miller, supra, the court considered a transfer of assets in exchange for stock of the successor company. The taxpayer's original employer, Strouss-Hirschberg Company, transferred all its assets to May Company for shares of May's outstanding stock. May continued the business and employed taxpayer and other Strouss-Hirschberg employees. Under the terms of the Strouss-Hirschberg trust agreement, its employees' rights to receive their respective shares of the trust became fixed on the day of the transfer of assets, when they became employees of May. The court stated:

. . . on that day they became eligible to receive distribution of their shares under the terms of the Trust Agreement because of their termination of service with the Corporation.

. . .

[P]etitioners' rights to receive distributions of their shares of the fund arose "on account of" their separation from the service of their employer . . . . 22 T.C. at 301.

In Lester B. Martin, supra, the Tax Court extended Mary Miller to a case in which there was no change of beneficial ownership incident to the corporate liquidation and plan termination which gave the taxpayer the right to receive payment. All the stock of Martin's original employer, Dellinger Manufacturing Company, was purchased by Sperry Corporation for cash. Six months thereafter, Sperry liquidated Dellinger and terminated the pension plan. The court concluded that the liquidation "resulted in a mass termination of the services of its employees . . . ." and that, "as in Mary Miller, the petitioner's rights arose on account of his separation from the service of his employer." 26 T.C. at 106. The court did not rely upon the transfer of beneficial ownership which had occurred when Sperry purchased all of Dellinger's stock.[8]

The Internal Revenue Code of 1954, which is applicable in this case, was enacted after the Tax Court's decision in Mary Miller, 22 T.C. 293 (1954), but before the decision of Lester B. Martin, 26 T.C. 100 (1956), and before the affirmance of Mary Miller by this court in Commissioner v. Miller, 226 F.2d 618 (1955). In section 402(a) (2) of the Code, Congress retained the provision of section 165(b) which granted capital gains treatment for lump-sum distribu-

---

and Profit-Sharing Plans, 17 Institute on Federal Taxation 951, 962 (1959). This suggests that the court might have reached a different result if the original employer had discontinued the plan contemporaneously with the transfer of assets.

8. See also Harry K. Oliphint, 24 T.C. 744, aff'd, 234 F.2d 699 (5th Cir. 1956), in which the Tax Court indicated, in dictum, that the change in stock ownership of the corporate employer did not alone result in a separation of the taxpayer from the service of his employer.

tions from employees' trusts upon death or other separation from the service.[9]

The House version of the bill additionally provided for capital gains treatment of lump-sum distributions made by reason of the termination of a plan as a result of the complete liquidation of a corporate employer. H.R. 8300, 83d Cong., 2d Sess. 97–98 (1954); H.R.Rep. No. 1337, 83d Cong., 2d Sess. (1954).[10] That provision would have provided capital gains treatment of lump-sum distributions whether or not there had been a change in beneficial ownership of the ongoing business.[11] This extension of capital gains treatment was restricted, by the Senate version of the bill, to distributions made during 1954.[12] The Senate version was adopted by the Conference Committee and became section 402(e) of the Internal Revenue Code of 1954, 26 U.S.C. § 402(e).[13] It has been

9. H.R.Rep. No. 2543, 83d Cong., 2d Sess. (1954) (conference report) states:
 The House bill retained the provision of existing law which grants capital-gains treatment for lump-sum distributions from employees' trusts on death or other separation from service . . . . These provisions were retained by the Senate amendment (secs. 402(a) (2) . . .). 3 U.S.Code Cong. & Admin. News 5280, 5301–02.

10. H.R. 8300, 83d Cong., 2d Sess. 97–98, provided in part:
 [I]f the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee by reason of the employee's death or other separation from the service, by reason of the death of the employee after his separation from the service, or by reason of termination of the plan as a result of the complete termination of the business of the employer, the amount of such distribution, to the extent exceeding the amount contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in taxable income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months.
 It was introduced on March 9, 1954.

11. Since this provision was regarded by its authors as an extension of existing capital gains provisions, it is apparent that some of the language of Mary Miller, 22 T.C. 293 (1954), aff'd, 226 F.2d 618 (6th Cir. 1955) (per curiam), went beyond existing law. The Tax Court had concluded in that case that a separation from the service within § 165(b) of the Internal Revenue Code of 1939 had occurred when the employing corporation was liquidated and the plan terminated following a transfer of its assets for stock. The court did not discuss the extent to which ownership and control of the business enterprise had changed.

 Similarly, the court in Lester B. Martin, 26 T.C. 100 (1956), was apparently in error in deciding that the termination of the plan incident to complete liquidation of the employer was, without more, a separation from the service within the meaning of § 165(b). The court did not discuss the effect of the preceding change in ownership of the corporation.

12. The Senate Finance Committee report states:
 Your committee's bill revises this provision of the House bill to eliminate the possibility that reorganizations which do not involve a substantial change in the make-up of employees might be arranged merely to take advantage of the capital gains provision. Thus, your committee's bill would grant capital gains treatment to lump-sum distributions occurring in calendar year 1954 where the termination of the plan is due to corporate liquidation in a prior calendar year. The purpose of granting capital gains treatment to such distributions is to avoid hardship in the case of certain plans which it is understood were terminated on the basis of mistaken assumptions regarding the application of present law. S.Rep.No. 1622, 83d Cong., 2d Sess. (1954), in 3 U.S.Code Cong. & Admin.News 4623, 4685–86 (1954).

13. Section 402(e) provides:
 Certain plan terminations.—For purposes of subsection (a) (2), distributions made after December 31, 1953, and before January 1, 1955, as a result of the complete termination of a stock bonus, pension, or profit-sharing plan of an employer which is a corporation, if the termination of the plan is incident to the complete liquidation occurring before the date of enactment of this title, of the corporation, whether or not such liquidation is incident to a reorganization as defined in section 368(a), shall be considered to be distributions on account of separation from service.

suggested that the capital gains treatment allowed by section 402(e) was limited to 1954, and not made permanently available, because

> [d]uring the course of the hearings before the Senate Finance Committee, it was pointed out by the Association of the Bar of the City of New York that such a provision might lead to abuse in that there could be technical compliance with the provision even though the business was continued. See Hearings before the Committee on Finance, United States Senate, 83d Cong., 2d Sess., p. 572 (1954). Victor S. Gittens, 49 T.C. 419, 428 (1968) (Tannenwald, J., concurring).

In a series of 1958 revenue rulings, the Commissioner of Internal Revenue indicated that the Internal Revenue Service regarded a change of ownership of the business controlling in some cases arising under section 402(a) (2).[14] For example, he stated that

> [f]or the reasons stated in Rev.Rul. 58–94, page 194, it is the position of the Internal Revenue Service that the liquidation of a wholly-owned subsidiary corporation does not, in and of itself, effect a "separation from the service" of an employer within the meaning of section 402(a) (2) of the 1954 Code. The rationale of the *Martin* case is therefore not considered controlling for the purposes of section 402(a) (2). Nevertheless, it is considered that the same result might be reached on similar facts under section 402(a) (2) of the Code, provided the acquisition of stock of the liquidated corporation and the later liquidation may be regarded as an integrated transaction in substance involving the purchase of the assets of the former employer corporation. The rule is well established by court decisions that the acquisition of the assets of a corporation in a series of steps, involving an initial purchase of its stock

and the later liquidation or merger of the acquired corporation into the acquiring corporation, may in substance constitute an acquisition of the assets for cash. See, for example, Commissioner v. Ashland Oil and Refining Co., 99 Fed. (2d) 588, certiorari denied, 306 U.S. 661, [59 S.Ct. 790, 83 L.Ed. 1057]; Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74, affirmed 187 Fed. (2d) 718, certiorari denied 342 U.S. 827, [72 S.Ct. 50, 96 L.Ed. 626]. In such cases there is a *real, as distinguished from a purely formal or technical, change in the ownership of the business,* and the fact that the necessary series of steps includes a corporate liquidation or reorganization does not preclude the result that a "separation from the service" of the former employer corporation has occurred. Rev.Rul. 58–95, 1958–1 C.B. 197, 199 (emphasis added).

In Rev.Rul. 58–94, 1958–1 C.B. 194, 196, the Commissioner discussed the legislative history of sections 402(a) (2) and 402(e) and stated:

> It is nevertheless the position of the Internal Revenue Service that Congress did not intend in section 402 to discriminate against the employees of a corporate employer by extending to them less favorable treatment than would be accorded under section 402(a) (2) in cases involving separation from the service of a noncorporate employer. The legislative history of section 402 discloses instead an attempt to deal, in the first instance favorably but in the ultimate outcome unfavorably, so far as concerns the prospective effect of the section, with a phase of the subject of separation from employment which is peculiar to the termination of plans of corporate employers by reason of corporate liquidations or reorganizations. This history makes it plain that a corporate

---

14. Rev.Rul. 58–94, 1958–1 C.B. 194; Rev.Rul. 58–95, 1958–1 C.B. 197; Rev. Rul. 58–96, 1958–1 C.B. 200; Rev.Rul. 58–97, 1958–1 C.B. 201; Rev.Rul. 58– 98, 1958–1 C.B. 202; Rev.Rul. 58–99, 1958–1 C.B. 202; Rev.Rul. 58–383, 1958– 2 C.B. 149.

liquidation or reorganization which brings about a change in employment relationship in no more than a formal or technical sense, and which does not involve a substantial change in the make-up of employees, is not enough to constitute a "separation from the service" under section 402(a) (2). *Nothing in the language of section 402 or in its legislative history, however, suggests that a separation from the service of a corporate employer does not occur where a corporate liquidation or reorganization is not itself the cause of termination of the employer's plan but is merely incident to such a change in the ownership of the business as might occur in the case of a noncorporate employer.* If, for example, the termination of a corporate employer's plan is incident to a sale of its stock to another corporation for cash, followed by the immediate merger of the employer corporation into the purchasing corporation, distributions to its employees under the plan may be on account of a separation from service, just as in the case of an individual or partnership employer which has sold its assets for cash, even though substantially all employees of the former business are re-employed by the purchaser.[15] [Emphasis added.]

The Commissioner took this position despite the fact that the reorganization considered in Rev.Rul. 58–94 was within the meaning of section 368(a) (1) (C) of the Code, 26 U.S.C. § 368(a) (1) (C). A reorganization under that section requires the acquiring corporation to acquire substantially all the property of another corporation in exchange for voting stock in itself or in a corporation which it controls. Hence, there could be a real change in the ownership of the business for the purposes of section 402(a) (2) despite the fact that the former owners of the acquired corporation continued to possess an interest in the business. This position was again emphasized in Rev.Rul. 58–383, 1958–2 C.B. 149, which concerned an exchange of stock for stock and then a merger of the smaller (acquired) corporation into the controlling corporation. The Commissioner stated that the transaction should be regarded as no different from an acquisition of assets by the controlling corporation:

> [I]t does not matter that the acquisition of the assets of the former employer corporation involved a statutory merger and that for some purposes the corporation surviving in a statutory merger is deemed to be a continuation of the corporation which loses its corporate life in the merger. . . .
> Had the facts surrounding the statutory merger been such as were involved in Stanton Brewery, Inc. v. Commissioner, 176 Fed.2d 573, or Newmarket Manufacturing Co. v. United States, 233 Fed.2d 493, involving, in the former case, the merger of an operating company into its parent holding corporation and, in the latter, the reincorporation of a single business in a new state, the problem of statutory construction would differ and the rule in question would be a factor to be considered along with the absence of a real change in ownership of the business. *Id.* at 151.

Several courts, however, have reached a different conclusion about the meaning of the legislative history. A statement which has fostered the disagreement is included in a Senate Finance Committee

---

15. An apparently inconsistent position was taken, however, in Rev.Rul. 58–98, 1958–1 C.B. 202. The Commissioner there considered a liquidation of a corporation by its two stockholder-employees which resulted in their ineligibility to participate in the plan. The business was continued as a partnership of the same two persons. Despite the fact that the same two persons owned and controlled the business before and after the transaction, the Commissioner ruled that "insofar as the two former stockholder-employees of the corporation are concerned, there was a 'separation from the service' of such corporation when they became partners within the purview of section 402(a) (2) of the Code." *Id.* at 202.

report of the differences between the House and Senate versions of the bill:

The House bill extends capital gains treatment to lump-sum distributions to employees at the termination of a plan because of a complete liquidation of the business of the employer, such as a statutory merger, even though there is no separation from service. This was intended to cover, for example, the situation arising when a firm with a pension plan merges with another firm without a plan, and in the merger the pension plan of the first corporation is terminated.

Your committee's bill revises this provision of the House bill to eliminate the possibility that reorganizations which do not involve a substantial change in the make-up of employees might be arranged merely to take advantage of the capital gains provision. Thus, your committee's bill would grant capital gains treatment to lump-sum distributions occurring in calendar year 1954 where the termination of the plan is due to corporate liquidation in a prior calendar year. The purpose of granting capital gains treatment to such distributions is to avoid hardship in the case of certain plans which it is understood were terminated on the basis of mistaken assumptions regarding the application of present law.

S.Rep.No.1662, 83d Cong., 2d Sess., in 3 U.S.Code Cong. & Adm.News pp. 4621, 4685–86 (1954).

In United States v. Johnson, 331 F.2d 943, 949 (5th Cir. 1964), the court stated:

On its face, Section 402(e) seems to say that *after 1954* distributions will not qualify for capital-gain treatment if they are made as a result of the termination of a plan incident to a corporate reorganization, even if the corporate employer is completely liquidated. Apparently, Congress was willing to approve Miller for one year, for the benefit of the limited number of persons who acted in reliance on that decision. In other words, after 1954 a separation from service would occur only on the employee's death, retirement, resignation, or discharge; not when he continues on the same job for a different employer as a result of a liquidation, merger or consolidation of his former employer. Section 402(a) (2) says nothing about corporate liquidations and reorganizations and seems to contemplate a distribution when a single employee "dies or severs his employment". In any event, as the Senate Committee has said, there is no separation from service incident to any "reorganizations [even complete liquidations] which do not involve a substantial change in the make-up of employees".[16]

After the Fifth Circuit's decision in *Johnson,* and a consistent Eighth Circuit decision in a related case, United States v. Martin, 337 F.2d 171 (8th Cir. 1964), one commentator concluded that it was unlikely that other courts would reach a

16. United States v. Johnson, 331 F.2d 943 (5th Cir. 1964), is one of three similar cases which arose from the 1955 acquisition of the Waterman Steamship Company by C. Lee Company through a cash purchase of 99% of the capital stock of Waterman. After it acquired Waterman, Lee terminated the Waterman retirement plan and made lump-sum payments to Johnson and other Waterman employees. Five months later, Lee merged into Waterman. In United States v. Johnson, the court held that Johnson was not entitled to capital gains treatment be-

cause he continued in the employ of Waterman, the corporate entity which terminated its plan, but which itself continued to exist. On these facts, it is clear that the statement set forth in our text is dicum. United States v. Peebles, 331 F.2d 955 (5th Cir. 1964), was decided by the court on the basis of its opinion in *Johnson.* In the third case, United States v. Martin, 337 F.2d 171 (8th Cir. 1964), the court stated that " . . . there is no basis here for disregarding the corporate entity of Waterman." *Id.* at 175.

result contrary to the conclusions stated by those courts. Nagel, Capital Gains Treatment for Employees on Lump-Sum Distribution from Qualified Pension and Profit-Sharing Plans, 43 Taxes 403 (1965). But another writer, who was the Chief of the Pension Trust Branch of the Internal Revenue Service, in a subsequent article, indicated that, in his opinion, the 1958 revenue rulings would be followed. Goodman, How To Obtain Capital Gains Treatment on Distributions from Qualified Plans, 24 J. Taxation 76 (1966).

Then, in Victor S. Gittens, 49 T.C. 419 (1968), a Tax Court majority adopted the position taken by the Fifth Circuit in United States v. Johnson, *supra*. The case involved a lump-sum distribution voluntarily received by Gittens following a reorganization agreement between his employer, Philco Corporation, and the Ford Motor Company. Under the plan of reorganization, Ford purchased all of Philco's assets in exchange for Ford common stock and the assumption of Philco's liabilities. A new Philco Corporation was formed in a state of incorporation (Delaware) different from that of the old corporate employer. The acquired assets were transferred to the new corporation, and the old Philco Corporation was liquidated. The new corporation adopted the plan and, in form at least, continued it, although it made no contributions. However, the plan amendments which allowed the new corporation to adopt the plan included a provision that allowed any participant who so desired to elect to have distributed to him his entire interest in the plan. Gittens executed an election form and received the total amount payable to him under the plan.

Despite the fact that Gittens would have received nothing if he had not elected to do so, the court stated that it regarded the distribution as having been made incident to and "on account of" the reorganization. The court also refused to attach any significance to the fact that the transferee corporation had adopted the plan, although it stated explicitly that it rejected the taxpayer's argument that the plan had not, in substance, been adopted by the new employer. Accordingly, the court found itself compelled to consider whether the reorganization had effected a separation from the service of the liquidated corporation. In concluding that it had not, the court found no difference between that case and United States v. Johnson, *supra*. In *Johnson*, the taxpayer's corporate employer had not been liquidated and he remained in its employ. The *Gittens* court refused to concede the controlling significance of the continued existence of the corporate entity in *Johnson*, stating: ". . . we discern no meaningful distinction between the transfer of stock and the transfer of assets." 49 T.C. at 425. The court then stated:

We are left, then, with the question of whether, as to an employment relationship, a change in the employer's State of incorporation is one of form or substance.

In answering this question, we place great weight on the congressional intent to ignore reorganizations not involving a "substantial change in the make-up of employees". The employees of Philco-Penn became employees of Philco-Del in the same capacities simply by reporting to work on December 11, 1961. No substantial change was made in the supervisory personnel after that date. Petitioner worked in the same capacity under the same superiors both before and after the reorganization. Apparently, the only personnel change involved the selection of a new president and a new production manager. The facts of this case do not establish a "substantial change in the make-up of employees" to render petitioner's change in employment more than one in form only. Consequently, we conclude that there was no "separation from the service" which entitles petitioner to have his distribution taxed as a long-term capital gain under section 402(a) (2). Since the distribution did not

occur in 1954, section 402(e) is inapplicable, and petitioner must report the entire amount received in 1962 as ordinary income. *Id.* (Footnote omitted.)

*But cf.* Whiteman Stewart, 53 T.C. 344, 348 n.5 (1969); Clifford M. Houg, 54 T.C. 792, 797 n. 3 (1970).

 Two concurring judges, however, analyzed the problem differently:

The majority, following the lead of Judge Wisdom in United States v. Johnson, 331 F.2d 943 (C.A. 5, 1964), seizes upon the words "substantial change in the make-up of employees" to support its rationale. In so doing, the majority, in my opinion, misreads the report of the Senate Finance Committee. That report reflects a concern with changes in employment involving no realistic structural change in the employer, such as the liquidation of a subsidiary corporation into its parent and a continuation of the business and the employment relationship without any accompanying change in beneficial ownership. That this is the case is revealed by the language in the committee report referring to "a substantial change in the make-up of employees" which *"might be arranged merely to take advantage of the capital gains provision"* (emphasis added; see S.Rept.No. 1622, *supra*) and to the fact that section 402(a) (2) is by its

terms directed toward the narrow area of corporate liquidations and not reorganizations generally.[17]

In effect, the majority unnecessarily and erroneously indicates that a change of employer accomplished as a part of a transfer of ownership can never be a "separation from the service" unless there is also a change in the makeup of the employee group—something that, in most transfers of businesses, is in fact unlikely to occur. Nothing in the legislative history requires such a rationale. Indeed, although section 402(e) may not have accomplished all that was originally intended by the House provision, I think it unwarranted, within the context of the total legislative history, to extend that section to situations beyond those involving modifications in corporate structures which bring about "a change in the employment relationship in no more than a formal or technical sense," i. e., unaccompanied by a meaningful change in the beneficial ownership of the business. See Rev.Rul. 58–94, 1958–1 C.B. 194, 196; Sellin, Taxation of Deferred Employee and Executive Compensation 368 (1960). 49 T.C. at 428–29 (Tannenwald, J., with whom Raum, J., joined, concurring) (footnote renumbered).

We agree with Judge Tannenwald's analysis.[18] We regard a transfer of

---

17. "The reference to 'reorganizations' would seem to have been intended to make sure that a statutory merger of a subsidiary into a parent would still be considered a liquidation." Victor S. Gittens, 49 T.C. 419, 428 n. 4 (1968) (Tannenwald, J., concurring).

18. The uninformative phrase "reorganizations which do not involve a substantial change in the makeup of employees" was intended to describe the type of unsubstantial changes which, if held sufficient to effect a separation from the service for the purpose of § 402(a) (2), would be used to withdraw earned income from a trust at capital gains rates by means of an otherwise meaningless manipulation of corporate structures. The legislative history indicates that § 402(e) was in-

tended to apply to changes in corporate structure not involving a change in ownership of the business. Both houses of Congress agreed that under § 402(e), a reorganization need not involve a change of ownership to allow capital gains treatment of distributions as a result of plan terminations incident to the liquidations. H.R.Rep. No. 1337, 83d Cong., 2d Sess., (1954), discussing the House proposal for extending capital gains treatment, stated:

The term *"complete termination of the business of the employer"* is defined to mean, in the case of an employer which is a corporation, the complete liquidation of such corporation whether or not such liquidation qualifies as a complete liquidation under section 336 and wheth-

ownership of the business as an important factor to be considered in determining whether a separation from the service has occurred.[19] And we also believe that the continued existence *vel non* of the employing corporate entity should not be disregarded. Martin v. United States, 337 F.2d 171, 175 (8th Cir. 1964); United States v. Johnson, 331 F.2d 943 (5th Cir. 1964); Nelson v. United States, 222 F.Supp. 712, 715–716 (D.Idaho 1963); William S. Bolden, 39 T.C. 829 (1963); Rev.Rul. 58–98, 1958–1 C.B. 202. *See generally* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 105 (2d ed. 1966).

Appellants emphasize that their employer's existence terminated, and assert that Gateway's acquisition of Cargo's stock, the merger of Cargo into Gateway, and Gateway's absorption of Cargo's employees were part of a single transaction which took three years to complete. The parties stipulated, and the District Court found, that Gateway intended, at the time it acquired all of Cargo's stock, to merge Cargo into Gateway after the acquisition. It was further stipulated that tax and business considerations were responsible for the delay of the merger until 1968. Appellants contend that, under these circumstances, we should disregard the delay for the purpose of applying section 402(a) (2).[20]

In response to this argument, the District Court stated:

Although it is stipulated that it was the intent, at the time of the acquisition of the stock of Cargo, that Gateway would at a subsequent date dissolve Cargo, it does not seem reasonable to assert that a "separation from employment" took place in 1965 based on a future contingent possible liquidation. It seems that reason would require the consideration of the possibility that minds of men can change based on business conditions or other-

er or not such liquidation is incident to a corporate acquisition of property, a statutory merger, or consolidation. 3 U.S.Code Cong. & Admin.News 4017, 4286 (1954). *See* note 10 *supra.*
The Senate Finance Committee, in the "Detailed Discussion of the Technical Provisions of the Bill" section of S.Rep. No. 1622, 83d Cong., 2d Sess. 289–90 (1954), discusses § 402(e), which limited the extension proposed by the House:
The disappearance of the corporate entity by reason of the merger or consolidation of such corporation with another corporation will constitute a liquidation for purposes of this provision. 3 U.S. Code Cong. & Admin.News 4621, 4928 (1954).

19. In United States v. Haggart, 410 F.2d 449, 452 (8th Cir. 1969), the court seemed to state its agreement with United States v. Johnson, 331 F.2d 943 (5th Cir. 1964), but it expressly declined to decide whether to follow either the majority or the concurring opinion in Victor S. Gittens, 49 T. C. 419, 426 (1968), on the grounds that, in *Haggart,* there was
no substantial change in the make-up of employees, there was only a technical change in the employment relationship, and there was no meaningful change in the beneficial ownership of the business. 410 F.2d at 452.

The court refused to follow Rev.Rul. 65–147, 1965–1 C.B. 180.

20. Appellants argue by analogy to the so-called "Kimbell-Diamond" rule, which takes its name from a leading case in which it was applied: Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74 (1950), aff'd, 187 F.2d 718 (5th Cir.), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951). The doctrine was developed in a line of cases which established that
where a party acquired all (or virtually all) of the stock of a corporation for the purpose of liquidating the corporation and thereby obtaining its assets, and then the corporation was promptly liquidated, the substance of the transaction was considered to be a purchase of assets through the medium of acquiring the stock. Consequently, on liquidation of the corporation, no gain or loss was recognized by the shareholders, and the shareholder's basis in the distributed property was equal to the purchase price. D. Kahn, Basic Corporate Taxation 59 (1970) (footnote omitted). *See also id.* at 69–70; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 9.44, at 375–378 (2d ed. 1966).

wise, and that a present intent to accomplish a liquidation in the future should not be the basis on which to give a taxpayer a favorable tax construction different from that given to other taxpayers of a like class, in situations where an employer's stock was acquired by another corporation and the acquiring corporation had no present intent to liquidate, but some three to five years later did liquidate the employer corporation.

■■ The District Court applied the wrong test. The statute required it to determine only whether the distributions were on account of the "separation from the service" of the employer, and it is clear that they were, even though the employer formally went out of existence after the date of distribution. The only time limitation in the statute requires that the total distributions payable to any employee be paid within one taxable year of the distributee so long as the payment shall be made on account of the separation from the service, and there is no requirement that the separation from the service occur before the distribution occurs or that both events must occur within the same year. It cannot be gainsaid that the trust was terminated because of Gateway's acquisition of Cargo and its ultimate absorption of sub-stantially all of Cargo's employees, including taxpayers. We hold that under the circumstances of this case, the distributions were on account of the employees' separation from the service within the meaning of section 402(a) (2).

Since a liquidation of the employer (in addition to a change in beneficial ownership) is essential to a finding of a separation from the service, it is meaningful to give substantial effect to the decision to liquidate made contemporaneously with the decision to terminate the plan. The required causal connection between the separation from the service and the distribution of the trust fund is no more apparent when the liquidation and the plan termination occur simultaneously than it is when the liquidation is postponed.[21]

It is true, of course, that, when there is a change in beneficial ownership and a deferred dissolution of the former employer, the determination of the subjective intent of the new owner will present some difficulty. In this case, however, the parties have stipulated that a liquidation was intended. In any event, we do not regard the problem of proof as insurmountable, and standards can be developed as they are required in the decision of particular cases.[22]

21. The parties have stipulated that Gateway terminated the Profit-Sharing Plan of Cargo because the Plan was no longer needed in the organization. Gateway had in operation a Pension Plan which would cover the new employees. The Treasurer, Mr. Kolhoven, read the plan and told the President and other board members of Gateway that it was his recommendation that the plan be terminated.

22. We observe that § 515(a) (1) of the Tax Reform Act of 1969, 83 Stat. 643 (1969), has limited § 402(a) (2) for plan years beginning after 1969:

§ 402. Taxability of beneficiary of employees' trust

(a) Taxability of beneficiary of exempt trust.—

. . . . .

(5) Limitation on capital gains treatment.—The first sentence of paragraph (2) shall apply to a distribution paid after December 31, 1969, only to the extent that it does not exceed the sum of—

(A) the benefits accrued by the employee on behalf of whom it is paid during plan years beginning before January 1, 1970, and

(B) the portion of the benefits accrued by such employee during plan years beginning after December 31, 1969, which the distributee establishes does not consist of the employee's allocable share of employer contributions to the trust by which such distribution is paid.

The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this paragraph.

To ameliorate the bunched-income effects of the lump-sum receipt of employer contributions made after January 31, 1969,

Finally, appellee argues that this case is analogous to Rybacki v. Conley, 340 F.2d 944 (2d Cir. 1965), in which the merger and liquidation of the acquired corporation occurred contemporaneously but the acquiring corporation expressly adopted the plan and continued it for two years before it was terminated and the distributions were made. The court there held that the distributions were not on account of the separation from the service of the former employer. *Compare* Funkhouser v. Commissioner, 375 F.2d 1 (4th Cir. 1967), aff'g E. N. Funkhouser, 44 T.C. 178 (1965), *with* Clifford M. Houg, 54 T.C. 792 (1970) *(noted,* I.R.Bul.No. 1970–34, at 6). When the plan is adopted by the successor corporation, it is clear that distributions on account of a later decision to terminate the plan are not on account of a separation from service. We need not decide the effect of a stipulation, in a case like *Rybacki,* that the plan would be continued only a certain length of time and then terminated as a result of the liquidation of the former employer.

▉ An additional reason exists for allowing capital gains treatment of the amount received by John H. Kaiser, who was separated from the service of his employer on September 30, 1965. The District Court found that the plan was terminated on July 14, 1965, when Cargo's Board of Directors resolved that

in accordance with the provisions of the Adkins Cargo Express, Inc. Employees Profit Sharing and Benefit Plan, that the Board of Directors of this corporation hereby elects to discontinue and terminate this Plan effective immediately or as soon as possible in accordance with the termination clause in this agreement.

.　　.　　.　　.　　.　　.

[T]he trust created by the Trust Agreement between Adkins Transfer Co., Inc. and First American National Bank covering Employees' Profit Sharing and Benefit Plan, first made and executed on January 1, 1953, and subsequently adopted and continued by Adkins Cargo Express, Inc., successor to Adkins Transfer Co., Inc., be and it is hereby terminated and discontinued pursuant to the provisions of Article VIII of said Trust Agreement, and that said termination shall take effect at the earliest possible date.[23]

Appellee argues that the December 29, 1965, payment to Kaiser was on account of the termination of the plan on July 14 and not on account of the termination of his employment on September 30. We observe that the statute does not require the distribution to be *solely* on account of separation from the service. It is not suggested that the amount of the distribution would have been different had the plan not been terminated. And there is no indication that the employment termination was not the unilateral act of his employer. This is not a case in which the employee might have voluntarily separated from the service of his employer in order to obtain capital gain treatment of his payment.[24] *See Wy-*

---

§ 515(b) of the Act, 83 Stat. 644 (1969), has substituted for capital gains treatment a special income-averaging provision within 26 U.S.C. § 72(n).

23. The agreement provided that, if the trust were to continue after termination of the plan, the trustee would exercise all of the powers and responsibilities of the committee which had administered the plan. In any event, the trust was to continue for sufficient time to allow distribution of the employees' respective shares. We do not consider whether that fact would have affected our decision had the distribution to Kaiser otherwise failed to qualify for capital gain treatment.

24. We were advised at argument that the president and sole stockholder of Cargo resigned in February 1965, and that the distribution to him was accorded capital gains treatment. We see no significant difference between his situation and Kaiser's because the sequence of events makes it apparent that the decision to terminate the trust had been made prior to the president's resignation, although the formal resolution of July 14 had not been adopted.

song v. United States, 326 F.Supp. 1384, 1387 (D.Minn.1971). When the employment relationship is terminated by the corporation and the employee thereafter receives a distribution of his share of a qualified plan, a decision to terminate the plan, made before or after the separation from service, does not affect the employee's right to capital gain treatment, except to the extent that his right to receive the distribution is dependent upon the termination of the plan. *See* T. E. Judkins, 31 T.C. 1022 (1959) (limited acquiescence withdrawn, and non-acquiescence substituted, 1963–1 C.B. 5). Accordingly, the judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.