ESTATE OF ROBERT A. STEFANOWSKI, DECEASED, JUNE STEFANOWSKI, SURVIVING SPOUSE, AND JUNE STEFANOWSKI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7942-73.    Filed December 19, 1974.

June Stefanowski, pro se.
*Juandell D. Glass,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $1,739.90 in petitioners' Federal income tax for 1971. The issues for decision are (1) whether the lump-sum distribution which petitioner June Stefanowski received from an employees' profit-sharing trust qualifies for capital gains treatment under section 402(a) (2)[1] and (2) whether any amount of such distribution is excludable from gross income as an employee's death benefit under section 101(b).

---

[1] Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.

## FINDINGS OF FACT

The facts of the case have been stipulated and are incorporated herein by this reference.

June Stefanowski (hereinafter petitioner) resided in Cincinnati, Ohio, at the time of filing the petition in this case. She filed a joint Federal income tax return for 1971, individually and in her capacity as surviving spouse of Robert A. Stefanowski, with the district director of internal revenue, Cincinnati, Ohio.

Petitioner's husband, Robert A. Stefanowski (hereinafter the decedent) died on February 23, 1971. Until the date of his death decedent was an employee of the Kroger Co. (hereinafter Kroger) and a participant in the Kroger Employees' Savings and Profit Sharing Plan (hereinafter the plan), a qualified plan under section 401(a).

The pertinent provisions of the plan were as follows:

### THE KROGER CO.
#### EMPLOYEES' SAVINGS AND PROFIT SHARING PLAN
#### THE PLAN

The Kroger Co., an Ohio corporation, hereinafter called the "Company" does hereby establish and adopt the following Employees' Savings and Profit Sharing Plan, hereinafter called the "Plan".

* * *

2. Effective Date. The Plan shall become effective on January 1, 1952 * * *.

3. Administration. (Trustees) The funds created hereunder shall be administered by three Trustees * * *.

* * *

5. Membership. (Employee Deposits) Eligible employees may become members of the Plan by filing a written application authorizing the Company to withhold from applicant's pay and deposit with the Trustees an amount which shall not exceed 5% of the applicant's regular weekly salary * * *.

* * *

(Withdrawal) A member may withdraw from the Plan at any time by filing * * * a notice of withdrawal. Retirement under the Kroger Retirement Program or separation from the employment after age 60 shall automatically constitute withdrawal from the Plan as of the last day of the year in which such retirement or separation occurs; provided that any member so retired or separated may withdraw from the Plan prior to the last day of such year by filing * * * a notice of withdrawal. Death prior to retirement, total and permanent disability or separation from employment otherwise than in connection with the member's retirement under the Kroger Retirement Program or his separation after age 60 shall automatically constitute withdrawal from the Plan as of the date of such occurrence.

6. Employees' Savings Fund. (Fund A) The fund of cash and investments, the earnings thereon and the proceeds thereof, created by employee deposits, shall be known as "Fund A," and the amounts or share therein assigned to the

members as hereinafter provided shall be known as "A Credits." In each year after 1952 the portion of Fund A attributable to current deposits in such year shall be segregated from the balance of Fund A until the close of such year.

(Assignment of A Credits) As of the close of 1952 Fund A shall be appraised by the Trustees and A Credits equivalent to such appraised value shall be assigned to the members in proportion to the amounts deposited by each in such year. As of the close of each succeeding year Fund A, excluding the segregated portion thereof attributable to current deposits, shall be appraised, taking into account the earnings thereon and capital gains and losses, whether or not such capital gains and losses have been realized. The aggregate of A Credits assigned and adjusted as of the close of the preceding year and still outstanding shall then be divided into such appraised value. The quotient, expressed in terms of percentage, shall then be applied to each member's A Credits, assigned and adjusted as of the close of the preceding year, and each member's A Credit account shall be adjusted upward or downward accordingly. The segregated portion of Fund A attributable to current deposits shall then be appraised as of the close of such year and additional A Credits equivalent to such appraised value shall be assigned to the members in proportion to the amounts deposited by each in such year.

7. Company Contribution. (Profit Sharing Formula)
\* \* \*

(Determination) Within sixty days following the close of each year, the Company shall deliver to the Trustees its contribution, if any, for such year, together with a statement showing its net income and the computation of its contribution, if any. \* \* \*

8. Company Contribution Fund. (Fund B) The fund of cash and investments, the earnings thereon and the proceeds thereof, created by Company contributions, shall be known as "Fund B," and the amounts or shares therein assigned to the members as hereinafter provided shall be known as "B Credits."

(Assignment of B Credits) As of the close of 1952, B Credits equivalent to the Company contribution for such year, after deducting all costs of administration chargeable thereto, shall be assigned to the members in proportion to the amounts deposited in Fund A by each in such year. As of the close of each succeeding year Fund B, excluding therefrom the Company contribution, if any, for the current year, shall be appraised by the Trustees, taking into account the earnings thereon and capital gains and losses, whether or not such capital gains and losses have been realized. The aggregate of B Credits assigned and adjusted as of the close of the preceding year, reduced by the preceding year-end value of the vested B Credits redeemed during the year, shall then be divided into such appraised value. The quotient, expressed in terms of percentage, shall then be applied to each member's B Credit account assigned and adjusted as of the close of the preceding year and still outstanding, excluding forfeited credits, and each such account shall be adjusted upward or downward accordingly. Additional B Credits equivalent to the Company contribution for the current year, if any, after deducting all costs of administration chargeable thereto, plus the amount of such appraised value properly allocable to provisional B Credits forfeited by withdrawals during the year, shall then be assigned to the members in proportion to the amounts deposited in Fund A by each in such year. ·

(Vesting Provisions) The assignment of B Credits shall be provisional until the same become vested. The amount of each member's B Credits which shall be "vested", and therefore subject to payment or redemption on withdrawal, shall be determined in accordance with the following provisions:

(a) If withdrawal shall result from the member's death, total and permanent disability, retirement under the Kroger Retirement Plan or separation from the employment after age sixty * * *, all "B" Credits theretofore provisionally assigned to the member shall immediately become vested. * * *
* * *

9. Redemption of Credits. (Withdrawal at close of year) Upon withdrawal from the Plan on the last day of any year, the assignment of the member's credits as of the close of such year shall proceed as hereinbefore provided as though he had not withdrawn, and as promptly as possible after the close of such year, the member or in the case of his death or legal disability his beneficiary or personal representative, shall be paid in one sum the amount of his A Credits and vested B Credits assigned as of the close of such year.

(Withdrawal during year) Upon withdrawal from the Plan during any year and prior to the last day thereof, the member, or in the case of his death or legal disability his beneficiary or personal representative, shall be paid in one sum the amount of his A Credits and vested B Credits assigned as of the close of the preceding year, subject to adjustment as hereinafter provided, plus his deposits for the current year. Upon such withdrawal, the member shall receive no credit, provisional or vested, in the Company contribution, if any, for the current year, or for any provisional B Credits forfeited upon the withdrawal of other members during the current year.
* * *

(Designation of Beneficiary) Each member may designate one or more beneficiaries to receive payment on account of his credits in event of his death or legal disability. Such designation shall be in writing filed with the Trustees and shall be subject to revocation or amendment at any time by the member. In default of such designation, payment upon the member's death or legal disability shall be made to his personal representative.
* * *

12. Termination. The Company reserves the right to terminate the Plan and its obligation to make contributions thereto as of the close of any month. Written notice of such termination shall be filed with the Trustees and the Committee not less than thirty days before the termination date.
* * *

(Liquidation) The A and B Credits to which each participating member is entitled shall be finally determined as of the date of termination. The Trustees shall thereupon proceed with the orderly liquidation of the two funds and shall make distribution thereof in cash, either at one time or installments over a period not to exceed five years, among the members as of the date of termination, the A Fund in proportion to such A Credits, and the B Fund in proportion to such B Credits without regard to whether the same are vested or provisional.
* * *

On January 9, 1970, the following resolution was adopted by the board of directors of the Kroger Co.:

RESOLVED, That the Kroger Co. Employees' Savings and Profit Sharing Plan, as amended, be further amended by adding the following Part II at the end of such Plan.

### Part II

14. In the event that the Company shall at any time permanently discontinue contributions to the Plan, then

(a) the A credits and B credits, including all provisional B credits, of all members of the Plan, shall be fully vested as of the discontinuation date;

(b) no members of the Plan shall make any deposits with the Trustees after the discontinuation date;

(c) * * * in the event of termination of the Plan and Trust, liquidation by the Trustees shall be effected as provided in Section 12 of the Plan, and the Trust, except that the Trustees in their discretion may distribute on any distribution date common shares of the Company held by the Trust in partial satisfaction of the members' respective B credits on a pro rata basis;

In December 1969, the members of the plan were informed that termination was set to occur as of January 2, 1971. Lack of participation by a large majority of employees was a major cause leading to this decision. On September 18, 1970, Kroger's board of directors resolved that "The Kroger Co. Employees' Savings and Profit Sharing Plan shall be terminated as of January 2, 1971,[2] in accordance with Sections 12 and 14 of the Plan." Also on September 18, 1970, the trustees of the plan, having been notified of the board's resolution, resolved "to proceed with an orderly sale of all assets held by the Trustees over the next several months * * * in order to permit lump-sum payments to be made to all beneficiaries of the Trust as soon as practicable after receipt in 1971 of The Kroger Co.'s contribution for 1970." The trustees further resolved "That the proceeds received from the sale of investments be invested in short-term cash equivalent assets including U.S. Treasury bills, certificates of deposit and/or commercial paper * * * pending the distribution of Trust assets to the beneficiaries."

On September 21, 1970, all plan members were notified of the decision to terminate. They were further told that they would—

receive 100% of both their Fund A and Fund B credits. Because it takes several weeks after the close of the year to calculate the amount of the Company's contribution to the Plan, and because it is necessary to know that amount

---

2 This was the last day of Kroger's fiscal year 1970.

before members' checks can be prepared, you should not anticipate receiving your check immediately after the close of the year. The checks will be in your hands from the Trustees as soon as possible but not later than March 31, 1971.

By February 23, 1971, the plan's investment portfolio had been liquidated and the proceeds invested in short-term Treasury bills with the exception of $1.8 million of common stock in Fund B and $900,000 of long-term Government bonds in Fund A. These items were sold and the proceeds reinvested in short-term Treasury bills by March 1, 1971.

On March 25, 1971, the trustees of the plan made a pro rata cash distribution of all the assets of the plan to the participants or their beneficiaries. Petitioner, as decedent's designated beneficiary (section 9 of the plan) received a distribution of $15,278.49, representing decedent's entire interest in the assets of the plan. Of this amount, $5,317.50 represented decedent's contributions which were nontaxable under section 402(a) and the remaining $9,960.99 represented the taxable portion of the distribution here in dispute.

During the period from January 3, 1971, to March 25, 1971, Fund A increased 1.9 percent in value and Fund B increased 1.8 percent in value. Included therein is a small appreciation in the value of the two funds between February 23, 1971, and March 25, 1971, the exact amount of which cannot be determined. The share of the appreciation attributable to the account of Robert A. Stefanowski for the period January 3, 1971, to March 25, 1971, was included in the $15,278.49 payment.

On her Federal income tax return for 1971, petitioner treated $4,960.99 as long-term capital gain, claiming that payment was made on account of decedent's death. In doing so, she reduced the $15,278.49 distribution by $5,317.50 (decedent's contributions) and $5,000 (death benefit exclusion, section 101(b)). Respondent determined that $9,960.99 was taxable as ordinary income.

OPINION

Petitioner, as the designated beneficiary of her deceased husband under the plan, received a lump-sum cash distribution from a qualified employees' profit-sharing plan in which the decedent was a participant. She contends that such distribution was paid on account of decedent's death and therefore, to the extent the distribution exceeded the amount of decedent's own contributions to the plan, is taxable as long-term capital gain

under section 402(a)(2).[3] Furthermore, petitioner contends that $5,000 of such distribution is excludable from her gross income as an employee's death benefit under section 101 (b).[4]

Respondent disputes each of petitioner's contentions on the ground that the distribution she received was paid on account of the termination of the plan and not on account of decedent's death. Respondent therefore has determined that the entire amount of the distribution, in excess of decedent's contributions, is includable in petitioner's gross income and taxable as ordinary income. It is undisputed that the plan is such as is described in section 401(a) and exempt from tax under section 501(a) and that decedent's beneficiary received the total distribution within 1 taxable year.

---

[3] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401 (a) which is exempt from tax under section 501 (a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities). * * *

(2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee * * * shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *

(3) DEFINITIONS.—For purposes of this subsection—
* * *

(C) The term "total distributions payable" means the balance to the credit of an employee which becomes payable to a distributee on account of the employee's death or other separation from the service, or on account of his death after separation from the service.

[4] SEC. 101. CERTAIN DEATH BENEFITS.

(b) EMPLOYEES' DEATH BENEFITS.—

(1) GENERAL RULE.—Gross income does not include amounts received (whether in a single sum or otherwise) by the beneficiaries or the estate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee.

(2) SPECIAL RULES FOR PARAGRAPH (1).—

(A) $5,000 LIMITATION.—The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000.

(B) NONFORFEITABLE RIGHTS.—Paragraph (1) shall not apply to amounts with respect to which the employee possessed, immediately before his death, a nonforfeitable right to receive the amounts while living. This subparagraph shall not apply to total distributions payable (as defined in section 402(a) (3)) which are paid to a distributee within one taxable year of the distributee by reason of the employee's death—

(i) by a stock bonus, pension, or profit-sharing trust described in section 401 (a) which is exempt from tax under section 501 (a),

Petitioner stakes her case on the fact that the date of decedent's death preceded the date of the distribution from the plan. Section 402(a)(2) requires something more, however; the relevant inquiry under that statute is not simply the sequence of events surrounding the distribution from the plan but rather the origin of the distributee's right to receive the distribution. *United States v. Johnson,* 331 F.2d 943, 952 (C.A. 5, 1964); *Wysong v. United States,* 326 F. Supp. 1384, 1387 (D. Minn. 1971); *Maurice Osterman,* 50 T.C. 970, 972, 974 (1968); *Jack E. Schlegel,* 46 T.C. 706, 710 (1966); *Lester B. Martin,* 26 T.C. 100, 106 (1956); *Mary Miller,* 22 T.C. 293, 301 (1954), affirmed per curiam 226 F.2d 618 (C.A. 6, 1955).

The facts of this case show that petitioner's right to receive the distribution in question originated in the termination of the plan and was implemented in accordance with the termination provision of such plan (sections 12 and 14). See *Jack E. Schlegel, supra.* Under that provision, each participant's proportionate share of the plan's assets was finally determined as of the date of termination and automatically became vested as of that date. As of the date of termination, the withdrawal and redemption provision of the plan (section 9) became inoperative and no further rights could arise under that provision. Decedent's death after the date of termination thus created no independent right on the part of petitioner to receive any distribution from the plan other than in accordance with the termination rights to which every other participant or beneficiary of the plan was entitled.

The facts make clear that by February 23, 1971 (date of death), the bulk of the plan had already been liquidated and decedent had been notified that he would receive his distributive share "as soon as practicable after receipt in 1971 of The Kroger Co.'s contribution for 1970."

In her petition herein, petitioner alleges that she "was entitled to the proceeds of the plan as her husband's beneficiary and as a result of her husband's heath [sic] prior to the distribution of the Trust Fund." This statement is correct insofar as it explains why petitioner, rather than the decedent himself or his estate, received the distribution in question. Petitioner was decedent's designated beneficiary under section 9 of the plan and as such was entitled to receive any payment due from the plan in the event of his death. It is therefore true that decedent's death determined the identity of the distributee in this case. But the identity of the

distributee is not the factor which determines the taxability of the distribution (section 402(a)(1), which speaks in terms of "any distributee"). Rather, the crucial factor is the origin of the distributee's right to receive the distribution from the plan, and here petitioner's right to receive the distribution originated in the termination of the plan and not in the death of her husband. See *Wysong v. United States, supra.*

We have found two cases which at first glance appear to support petitioner's position herein. In *Smith v. United States,* 460 F.2d 1005, 1017-1018 (C.A. 6, 1972), a taxpayer was allowed capital gains treatment for a lump-sum distribution from a qualified profit-sharing plan in a situation where his separation from employment intervened between the date of the plan's termination and the date of the distribution. The Sixth Circuit Court of Appeals stated therein that section 402(a)(2) "does not require the distribution to be *solely* on account of separation from the service." 460 F.2d at 1017 (emphasis in original). Compare *Richard N. Gunnison,* 54 T.C. 1766, 1771-1772 (1970), affd. 461 F. 2d 496 (C.A. 7, 1972). Despite the apparent similarity in the sequence of events herein and *Smith* (termination, separation from service, distribution), we think that the instant case fails to come within the holding of *Smith.* Most importantly, the Court of Appeals there concluded that the taxpayer's separation from service was *a* cause, even if not the *sole* cause, of the distribution he received from the plan. Here we have concluded that decedent's separation from service by reason of death was not a cause of the distribution to petitioner. Moreover, in *Smith* the court noted that the distribution there apparently would not have been any different in amount if the plan had not been terminated. 460 F.2d at 1017-1018. Here the amount of the distribution to petitioner was increased by the appreciation (albeit small in amount) in the plan's assets between the date of decedent's death and the date of distribution (see p. 392 *supra*). If, instead, the distribution to petitioner had arisen on account of decedent's death, the amount of the distribution would have been somewhat less than the $15,278.49 which petitioner received.

*Thomas E. Judkins,* 31 T.C. 1022 (1959), upon which the Court of Appeals for the Sixth Circuit relied in its *Smith* opinion, also involved a sequence of events analogous to those in the instant case (termination of the plan, separation from service,

distribution) where the taxpayer was allowed capital gains treatment for a lump-sum distribution from a qualified employees' plan. Like *Smith,* however, *Judkins* is distinguishable from the instant case in that the amount of the distribution there would have been the same either on account of the taxpayer's separation from service or the termination of the plan. In *Judkins,* we found that the plan was not definitely terminated at the time of the separation from service. 31 T.C. at 1027. See also *Jack E. Schlegel, supra.* Hence, in that case, as contrasted with the present case, the employee's rights became absolutely fixed at the date of his separation from service. See *United States v. Johnson,* 331 F.2d at 953-954; *Mary Miller,* 22 T.C. at 302.

Petitioner's claim for a death benefit exclusion under section 101(b) must likewise fail because of our conclusion that the distribution she received was paid on account of the termination of the plan rather than "by reason of the death of the employee."

We recognize that petitioner will probably consider that the result we reach herein is a harsh one, insofar as there is no apparent rationale why some recipients of lump-sum distributions from an employees' plan are entitled to capital gains treatment while others, like petitioner, are foreclosed from such favorable treatment under the statute. In the Tax Reform Act of 1969 (Pub. L. 91-172, 83 Stat. 487), Congress acted to eliminate such discrepancy by prospectively denying capital gains treatment to all such distributees. See sec. 402(a)(5). In any event, the result we have reached is mandated by the terms of the statute as it existed during the taxable year in issue.

*Decision will be entered for the respondent.*