MARCIA K. AND ROBERT M. SARMIR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1074-75.    Filed April 12, 1976.

Robert M. Sarmir, pro se.
*Rudolf L. Jansen,* for the respondent.

OPINION

STERRETT, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1972 in the amount of $233.95. The sole issue for decision is whether a distribution to petitioner Robert M. Sarmir of his entire interest in the Kimberly-Clark Corp. Salaried Employees' Retirement Plan was made on account of his separation from service of his employer so as to qualify, in part, for treatment as a long-term capital gain pursuant to section 402(a)(2), I.R.C. 1954.[1]

All of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Robert M. Sarmir (hereinafter petitioner) and Marcia K. Sarmir, husband and wife, were residents of Dayton, Ohio, at the time they filed their petition herein. Petitioners filed a joint Federal income tax return with the Internal Revenue Service for the calendar year 1972.

Since January 1, 1944, Kimberly-Clark Corp. (hereinafter Kimberly) has had in effect a noncontributory Salaried Employees' Retirement Plan (hereinafter the plan), which is the merged successor of the Coosa River Newsprint Co. Salaried Employees' Retirement Plan.[2] The Kimberly-Clark Retirement Trust (hereinafter trust) was established on August 13, 1944, as the funding medium for the plan and Chase Manhattan Bank (National Association) (hereinafter trustee) was the trustee thereof. The trust satisfied the requirements of section 401(a) and was exempt from tax under section 501(a).

The plan, as amended through June 24, 1969, provides in pertinent part as follows:

ELIGIBILITY

2.1 *Basic Benefit:* An *Employee* who has 15 years of *Service* shall be eligible for a Basic Benefit if the termination of his employment shall be by reason of his having attained the age of at least 57.

\* \* \*

2.5 *Deferred Benefit:* An *Employee* who has had 15 years of *Service* shall become eligible for a Deferred Benefit upon attaining age 65 or upon filing an application therefor, whichever is later, if

(i) he is not eligible for a Basic Benefit by reason of such *Service,* and

(ii) he has, after attaining age 64 and before attaining age 70, filed with the Committee an application for a Deferred Benefit.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

[2] The plan was fully funded at all relevant times.

* * *

3.12 *Other Forms of Payment:* With respect to a person who

(i) is eligible for a Basic Benefit under Section 2.1 hereof, and

(ii) whose termination of employment is by reason of his having attained the age of at least 62, the Committee may, in its sole discretion, upon the written request of such person, direct that his Basic Benefit be paid otherwise than as expressly set forth in the Plan, * * *

* * *

8.1 *Right to Terminate:* The Corporation may, by resolution of its Board of Directors, terminate the Plan at any time. In the event the Corporation shall for any reason cease to exist, the Plan shall terminate unless the Plan and Trust are continued by a successor.

8.2 *Liquidation of Trust Fund:* Subject to Article IV, upon termination of the Plan, each *Employee* shall have a vested right to *Benefits* without requirement of further employment, and the Committee shall direct the Trustees to allocate the assets in the Trust attributable to this Plan, to the extent that such assets are sufficient to provide *Benefits,* in the following order of precedence:

* * *

8.3 *Manner of Distribution:* The Committee shall direct that any distribution upon liquidation of the Trust may be made in cash or, to the extent no discrimination in value results, in securities or in other assets in kind or in insurance or annuity contracts, as the Trustees in their discretion may determine. * * *

8.4 *Exclusion of a Participating Unit:* The Corporation may, by resolution of its Board of Directors, exclude from the Plan a group consisting of all or any part of any *Participating Unit.* Upon such exclusion, a determination shall be made by the Committee of the portion of the assets of the Trust which is attributable to contributions made for the group so excluded, taking into consideration any assets transferred to the Trust from a predecessor trust on behalf of such group. Such determination shall be made in a manner which is equitable and nondiscriminatory under the then applicable Internal Revenue Code. In the discretion of the Board of Directors of the Corporation, such portion of the assets of the Trust shall be distributed among the persons in such excluded group in accordance with the procedure for liquidation set forth in this Article, or transferred to a qualified successor retirement trust for such persons, or set aside for such persons in another qualified plan within the Trust, and thereupon all obligations under this Plan to the persons in the excluded group shall be deemed discharged pro tanto.

On February 1, 1960, petitioner commenced his employment with Kimberly at its Moraine, Ohio, mill (hereinafter the mill) and remained so employed until approximately September 15, 1972, when Bergstrom Paper Co. (hereinafter Bergstrom) purchased the mill. At the time of the sale petitioner was 40 years old and was serving as an accounting supervisor. During the period of his employment with Kimberly, petitioner was a participant in the plan.

Subsequent to its acquisition of the mill Bergstrom retained petitioner as an accounting supervisor and on October 1, 1972, promoted petitioner to division controller of the mill.[3] He remained in that capacity until approximately December 31, 1974, at which time he voluntarily terminated his employment. Petitioner experienced no break in service as a result of the sale of the mill to Bergstrom.

The decision to dispose of the mill was reached by the board of directors of Kimberly on September 15, 1971. Subsequently, at a meeting held on December 13, 1971, the executive committee of the board of directors passed a resolution, pursuant to plan section 8.4, excluding from the plan the members of the mill's participating unit. The termination with respect to the mill's participating unit was to take effect on the date the mill was sold or closed, whichever was the first to occur.[4] The executive committee also directed the plan's retirement committee to determine the portion of the trust's assets allocable to the benefits of the participating units so excluded,[5] and further directed that one or more group annuity contracts be purchased to provide such benefits.

On October 26, 1972, Kimberly filed Form 4576, an application for determination, termination, or curtailment of plan, with the Internal Revenue Service, Milwaukee, Wis., for the purpose of obtaining approval of the partial termination of the plan. The effective date for the partial termination with respect to those employees working at the mill was stated on this application to be September 15, 1971, the date on which the board of directors of Kimberly decided to dispose of the mill.[6]

Pursuant to the aforenoted resolutions the trustee entered into a contract dated February 1, 1972, with Bankers Life Co. (hereinafter Bankers), for the purchase of a single premium group annuity contract for the purpose of providing benefits in accordance with plan section 8.2. The contract provided that each participating employee was entitled to elect to receive his

---

[3] Virtually all Kimberly employees who worked at the mill were retained by Bergstrom.

[4] The agreement for the sale of the mill was reached on or about Aug. 31, 1972. Although the exact date of sale does not appear in the record, it is clear that the sale was consummated and the plan terminated with respect to the mill's participating unit by Sept. 15, 1972.

[5] Several other participating units from various other mills were similarly excluded.

[6] As noted by respondent on brief, this statement is in conflict with the resolution under which termination was to occur, the earlier of the sale or closing of the mill. The sale occurred early in September 1972.

benefit in one of the following forms: (1) A certain and life annuity; (2) a survivorship annuity; or (3) a lump-sum cash payment.[7]

On September 29, 1972, Kimberly sent to Bankers computerized punchcards containing the benefit data with respect to its employees who were members of the previously excluded participating unit of the mill. Attached thereto was an employee list disclosing the benefit data relative to petitioner.

On or about October 12, 1972, Bankers sent to petitioner a form letter which contained information concerning his benefits under the group annuity policy. This letter in part provided:

> As you have already been notified, funds from the Kimberly-Clark Retirement Trust have been deposited by the Trustee, The Chase Manhattan Bank (NA), with Bankers Life Company. An annuity has been purchased for you under Group Contract GA 9464. By direction of the Trustee, this letter and Statement of Benefits Card are being sent to you to explain your retirement benefit and several alternative choices available to you in connection with it.
>
> *The benefit purchased for you is a "straight life" benefit payable at age 65* in an amount determined according to the applicable Kimberly-Clark Retirement Plan. You may leave the benefit in this form or you may elect at this time to (1) convert it to a benefit having a reduced amount of monthly income but with a Death Benefit or a Termination Benefit payable in a lump sum upon death or termination of employment during the period prior to retirement, or (2) take an immediate Single Sum Payment in lieu of all other benefits under this contract. Each of these benefits is explained in more detail below.

Enclosed therewith were an election form and a statement of benefits advising petitioner that he was entitled to a normal retirement benefit of $113.72 per month, an elective retirement benefit of $92.12 per month, or a single sum payment of $2,126.57.

On October 17, 1972, petitioner executed the annuity benefit form on which he elected to receive a single lump-sum payment in the amount of $2,126.57. Pursuant to this election, on November 10, 1972, Bankers sent a check in that amount to petitioner which represented the total distribution payable to him under the terms of the plan. The total distribution comprised benefits accrued by petitioner prior to January 1, 1970, in the amount of $1,718.51 and benefits accrued sub-

---

[7] In connection with the agreement the trustee remitted to Bankers Life Co. a wire transfer in the amount of $7,354,270.36. The sum was refundable to the extent that any employee did not elect to participate in the arrangement. The deadline for such decision with respect to persons employed at the mill was May 1, 1972. The deadline was later extended until June 1, 1972.

sequent to December 31, 1969, in the amount of $408.06. The latter benefits are not eligible for treatment as a long-term capital gain pursuant to section 402(a)(5) as in effect for the year 1972.[8]

On their return for 1972, petitioners treated the entire distribution as a long-term capital gain and respondent determined that the entire amount of the distribution should be taxed as ordinary income under sections 402(a)(1) and 72. Petitioners have conceded that the portion of the distribution attributable to the benefits accrued by petitioner after December 31, 1969, is not entitled to treatment as a long-term capital gain. Hence we must decide the proper character of the portion of the distribution attributable to the benefits accrued prior to January 1, 1970.

Pursuant to section 402(a)(2)[9] as in effect for 1972, distributions from an employees' pension trust are to be accorded treatment as a long-term capital gain provided that: (a) The trust is a qualified trust exempt from tax under section 501(a); (b) the distributions represent the distributee's entire interest in the trust and are paid within 1 taxable year of the distributee; and (c) the distributions are paid on account of the employee's death or separation from service. The parties agree that the distribution in issue satisfies the first two of the above requirements.

---

[8] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a)(5) LIMITATION ON CAPITAL GAINS TREATMENT.—The first sentence of paragraph (2) shall apply to a distribution paid after December 31, 1969, only to the extent that it does not exceed the sum of—

(A) the benefits accrued by the employee on behalf of whom it is paid during plan years beginning before January 1, 1970, and

(B) the portion of the benefits accrued by such employee during plan years beginning after December 31, 1969, which the distributee establishes does not consist of the employee's allocable share of employer contributions to the trust by which such distribution is paid.

The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this paragraph.

[9] Sec. 402(a)(2) as in effect for 1972 provides:

SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a)(2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *

They further agree that petitioner was in fact separated from the service of his employer, Kimberly, leaving for us to decide only whether or not the distribution received by petitioner was made on account of his separation from service of Kimberly.

We have on various occasions considered whether or not the nexus between a distribution from a qualified trust and the distributee's separation from service was sufficient to render the payment "on account of the employee's separation from service" and have construed that phrase to require that the payment or payments be made solely because of the employee's separation from service. See *Richard N. Gunnison,* 54 T.C. 1766 (1970), affd. 461 F. 2d 496 (7th Cir. 1972). The focal point for a determination of whether or not the requisite causal relationship exists must, of course, be the genesis of petitioner's right to receive the distribution. *Estate of Robert A. Stefanowski,* 63 T.C. 386 (1974); *United States v. Johnson,* 331 F. 2d 943, 952 (5th Cir. 1964); *Mary Miller,* 22 T.C. 293, 301 (1954), affd. per curiam 226 F. 2d 618 (6th Cir. 1955). Hence petitioner must, to succeed in upsetting respondent's determination, demonstrate that his right to receive the distribution originated in his separation from Kimberly rather than in the termination of the plan [10] as contended by respondent. *Welch v. Helvering,* 290 U.S. 111 (1933).

We think it obvious, after a careful consideration of the evidence, that petitioner's right to receive the distribution at issue was engendered solely by the termination of the plan and the resolutions passed in accordance with the termination provisions thereof. Under plan section 8.2 petitioner's share of the trust assets allocable to his participating unit became fully vested as of the date of termination which, pursuant to the resolution of December 13, 1971, was the date on which the mill was sold. Consequently at that time the eligibility sections of the plan, 2.1 and 2.5, became inoperative with respect to the excluded units and petitioner could obtain no further rights thereunder. Hence, any rights to which petitioner was entitled apart from the termination of the plan must have vested prior to the date of the sale of the mill and the termination of the plan. Unfortunately for petitioner, at that time he was but 40 years of age with less

---

[10] Sec. 1.401-6(b)(2), Income Tax Regs., provides that the term "termination" encompasses both partial and complete terminations. For purposes of simplicity the partial termination of the plan is referred to as the termination of the plan.

than 13 years of service with Kimberly and, therefore, failed to meet both the age and service requirements set forth in plan sections 2.1 and 2.5. In other words, had petitioner been separated from service without the occurrence of the plan termination he would have received no benefit under the relevant plan provisions. Hence, we are led to the inevitable conclusion that petitioner's benefit was paid solely on account of the termination of the plan and that his separation from service was, in this context, irrelevant.

In so deciding we are, of course, well aware of the decision of the Sixth Circuit Court of Appeals, to which an appeal in the instant case would lie, in *Smith v. United States,* 460 F. 2d 1005 (6th Cir. 1972). The court stated therein that a distribution need not be made solely on account of separation from service to satisfy the requirements of section 402(a)(2). *Smith v. United States, supra* at 1017. However, we find the facts herein to be materially different from those in *Smith.* Most importantly, in *Smith* there existed a dual reason for the distribution, one of which was the taxpayer's separation from service. Here, to the contrary, we have found that the distribution was caused by the termination of the plan and that his separation from service was not a causal factor in petitioner's receipt of the distribution. Furthermore, the court in *Smith* noted that the amount of the distribution would have been the same in the event of either the plan termination or the taxpayer's separation from service. Unlike the taxpayer in *Smith,* however, petitioner would have received no benefit had he separated from service and the plan been continued. Since we find *Smith* to be clearly distinguishable, we need not invoke our holding in *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

Petitioner has cited Rev. Rul. 72-440, 1972-2 C.B. 225, wherein the Internal Revenue Service revoked a series of earlier rulings[11] and took the position that an employee would be considered separated from service within the meaning of section 402(a)(2) only in the event of his death, retirement, resignation, or discharge, but not when he continued to do the same job for a new employer as a result of a liquidation, reorganization, or sale.

---

[11] See Rev. Rul. 58-94, 1958-1 C.B. 194; Rev. Rul. 58-95, 1958-1 C.B. 197; Rev. Rul. 58-96, 1958-1 C.B. 200; Rev. Rul. 58-97, 1958-1 C.B. 201; Rev. Rul. 58-98, 1958-1 C.B. 202; Rev. Rul. 58-383, 1958-2 C.B. 149; Rev. Rul. 65-147, 1965-1 C.B. 180.

The shift in the Service's position was not retroactive and petitioner claims to have constructively received the distribution prior to September 18, 1972, the effective date of Rev. Rul. 72-440, *supra,* thereby placing his distribution within the penumbra of the since revoked rulings.[12] We find no merit in petitioner's argument.

A precondition to petitioner's constructive receipt of the distribution prior to his actual receipt thereof is the unqualified right on petitioner's behalf to demand payment at any time. *Fetzer Refrigerator Co. v. United States,* 437 F. 2d 577 (6th Cir. 1971). In other words, petitioner must have had the ability to "have drawn upon [the trust assets] at any time during the taxable year if notice of intention to withdraw had been given." Sec. 1.451-2(a), Income Tax Regs. We think it obvious that petitioner possessed no such power and lacked the ability to obtain his benefit prior to the date on which he was in actual receipt thereof.

Assuming arguendo that petitioner did constructively receive his benefit prior to September 18, 1972, we think his reliance upon the revenue rulings revoked by Rev. Rul. 72-440, *supra,* is misplaced. These rulings do no more than interpret the term "separation from service." Respondent has conceded that petitioner was separated from service within the meaning of section 402(a)(2), and the rulings have no bearing on the question of whether the distribution was made on account of such separation. However, even if the rulings were pertinent to our inquiry the simple answer to petitioner's contention is that the resolution of the issue before us must find its roots in the statute itself and not in respondent's interpretation thereof. *United States v. Haggart,* 410 F. 2d 449 (8th Cir. 1969).

Finally, petitioner argues that Kimberly's sale of the mill resulted in a mass separation from service of all employees

---

[12] Petitioner has also cited sec. 402(a)(2) as it presently provides, and on brief argues further that prior to his election respondent's agents advised him that he would be entitled to treat the distribution as a long-term capital gain. With respect to present sec. 402(a)(2), the bare fact is that it did not become effective until after 1973, and has no bearing on distributions made during 1972. With regard to petitioner's estoppel argument, the record simply contains no evidence, whatsoever, that the Internal Revenue Service ever gave any advice to petitioner. Furthermore, even if such advice were given it would be based on a mistake of law and it is well-settled that the doctrine of equitable estoppel does not bar respondent from correcting a mistake of law. *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180 (1957).

working at the mill which in turn caused a distribution to be made to each such employee. Although not lacking in surface appeal we think petitioner's argument proves too much. Were it true, every sale of a business would result in capital gains treatment to every employee thereby separated from service.provided that the employee received his distribution within 1 taxable year. Clearly, this would obliterate the distinction drawn in both the case law and regulations between distributions made on account of separation from service and distributions made on account of the termination of the plan in the context of a sale of a business. Rather, we feel the appropriate inquiry in this context is to examine the facts and circumstances surrounding the origin of the right of each individual distributee, who petitions this Court, to receive the distribution.

No doubt it will be of little solace to petitioner, but he is to be commended for the forthrightness with which he asserts his position. Certainly he has not attempted to defraud the Government. He decries the possibility that justice may turn on a "technicality." However, unfortunate as it may sometimes be, in the greater interests of a uniform administration of the tax laws, the courts are frequently required to resolve disputes on what may reasonably appear to be a mere technicality.

In accordance with the foregoing,

*Decision will be entered for the respondent.*