LEE L. BLYLER AND EVELYN G. BLYLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5598–75.   Filed February 28, 1977.

*Walter H. McLaughlin, Jr.,* for the petitioners.
*John O. Tannenbaum,* for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined the following deficiencies in petitioners' Federal income taxes:

| | |
|---|---|
| 1971 | $1,102 |
| 1972 | 3,140 |

The sole issue is whether certain distributions received by petitioner Lee L. Blyler from the Howe & French Pension Trust are entitled to capital gains treatment under section

402(a)(2), I.R.C. 1954, as in effect during the calendar years 1971 and 1972.[1] The facts have been stipulated.

Petitioners Lee L. Blyler and Evelyn G. Blyler, husband and wife, resided in Sharon, Mass., at the time the petition herein was filed. They filed their joint Federal income tax returns for the calendar years 1971 and 1972 with the Director, Internal Revenue Service Center, Andover, Mass. Since Evelyn G. Blyler is a party herein solely by virtue of having filed joint returns with her husband, Lee L. Blyler will hereafter be referred to as the petitioner.

Petitioner was president of Howe & French, Inc. (the company), which, on September 30, 1964, established a pension trust for its employees. By letter dated April 21, 1965, the Internal Revenue Service ruled that the trust was exempt from tax under section 501(a), I.R.C. 1954, and that it met the qualification requirements of section 401(a). Contributions to the trust were made both by the employer and the participating employees. Petitioner was not only a participant in the trust but was also one of the three trustees. The other two trustees were David J. O'Connell and Herbert Snow. The terms of the trust, as amended and in effect on and after September 27, 1968, included the following:

This AGREEMENT, called Howe & French Pension Trust and hereinafter referred to as the "Trust", by and between Howe & French, Inc., a Massachusetts corporation, hereinafter referred to as the "Employer" and Lee L. Blyler, Herbert W. Snow and David J. O'Connell, as Trustees and their successors, hereinafter referred to as the "Trustees",

\* \* \*

### ARTICLE VII TERMINATION OF EMPLOYMENT

\* \* \*

7.04 Participant's Rights on Termination of Employment. Upon the termination of a Participant's employment, the rights of the Participant in the values standing to his account under the Trust shall be disposed of as follows:

---

[1] All references herein to the Internal Revenue Code are to the Code as in effect for the calendar years 1971 and 1972. For taxable years beginning after Dec. 31, 1973, substantial changes were made in the Code affecting the taxation of distributions made after that date. See sec. 2005 of the Employee Retirement Income Security Act of 1974, Pub.L. 93–406, amending Code sec. 402.

(a) Upon the termination of a Participant's employment, after having been a participant in the plan for a period of at least ten (10) years, the Participant shall have a vested equity in the value of the policy on his life.
 * * *

(c) In addition to the above values referred to in (a) above, a participant shall be entitled to a vested equity in the Separate Investment Fund, based on his years of participation in the Plan, as follows:

| *Number of Years of Participation* | *Vested Equity* |
|---|---|
| Less than 10 years | 0% |
| 10 years but less than 11 years | 10% |
| * * * | |
| 19 years and over | 100% |
| * * * | |

7.07 Termination Prior to Expiration of Ten Years' Participation in Plan. If a Participant's employment is terminated prior to the expiration of ten years' participation in the plan, he shall forfeit any and all interest under this trust.
 * * *

## ARTICLE X AMENDMENT AND TERMINATION OF TRUST

 * * *

10.02 Termination of Trust. After this Trust shall have been approved by the Internal Revenue Service, as provided in Section 1.02, the Trustees or the Employer shall have the power to terminate it in its entirety. * * * If the Trust shall be so terminated, the rights of each Participant to the benefits accrued to the date of such termination, to the extent then funded for him, shall be non-forfeitable and, subject to the provisions of Article XIII, each Participant or the Beneficiary of a deceased Participant shall be vested in the values being held to fund his benefits including a share of any unallocated Trust assets, which share shall be determined in accordance with Section 10.04, and his share of the Trust assets shall be distributed to him subject to the provisions of Article XIII.
 * * *

10.04 Distribution of Trust Assets. In the event that a distribution is to be made in connection with a complete or partial termination of Trust, the Trustees shall distribute to each affected Participant or his Beneficiaries any Policy, or the values thereof, held for his benefit. In addition, they shall marshal the assets of the Trust, shall apportion unallocated funds as hereinafter provided and, subject to the provisions of Article XIII, shall make distribution to the several Participants as their interests may appear.
 * * *

## ARTICLE XI THE TRUSTEES

11.01 Number of Trustees. There shall be three Trustees who shall hold the funds and assets received by them subject to the terms of this Trust and upon the uses and trusts and for the purposes herein set forth. The Trustees

shall be responsible only for such funds and assets as shall actually be received by them as Trustees hereunder.

\* \* \*

11.03 A Majority of Trustees to Act: Any One to Sign Papers Required by Insurer. Acts and decisions of the Trustees shall be by a majority of the Trustees either in a meeting or without a meeting but in writing signed by a majority. Any one of the Trustees may sign on behalf of all, applications for Policies or any papers which may be required by the Insurer.

\* \* \*

11.06 Trustee's Individual Liability. Except for gross negligence, willful misconduct or willful breach of this Trust, no Trustee shall incur any individual liability for his act or failure to act pursuant to this Trust. Each Trustee shall be protected in acting upon any document believed by him to be genuine and to have been executed or delivered by the party purporting to have executed or delivered the same. No Trustee shall be liable for the act of any other Trustee. The Trustees may engage agents to assist them in their duties and may consult counsel who may be of counsel to the Employer. The Trustees shall be relieved of all responsibility for anything done or not done in good faith on advice of counsel.

11.07 Construction of Trust and Indemnification of Trustees. In the event of any ambiguity, the Trustees shall have power to construe this Trust and their construction of the same, made reasonably and in good faith, shall be final and conclusive. The Trustees may postpone performance until adjudication of their action in a court of competent jurisdiction or until they shall have been indemnified to their satisfaction.

On or about April 20, 1970, Howe & French, Inc., was acquired by Landsverk Corp., apparently by means of a stock purchase agreement. Shortly thereafter, employees of Howe & French, Inc., began to be dismissed from their positions, and in early 1971 petitioner became aware of the possible termination of his position as president. He was in fact discharged on or about April 1, 1971, and since that time he has not been employed by either Howe & French, Inc., or Landsverk Corp. or any of its subsidiaries or affiliates.

In January 1971 petitioner learned that the pension trust was to be terminated due to the decline in profits of Howe & French, Inc., and Landsverk. Upon application (apparently signed by David J. O'Connell as trustee) to the District Director in Boston, approval for such termination was received with an effective date of February 15, 1971.

On June 7, 1971, petitioner and Herbert Snow were removed as trustees of the trust. At that time, the assets of the trust consisted of life insurance policies on the trust participants' lives, and cash assets held in a trust bank account with respect to which Herbert Snow was the only

authorized signatory. Snow, upon being relieved of his duties as trustee, refused, on or about June 21, 1971, to release the funds contained in the trust bank account. It was Snow's demand that he first be allowed a $1,000 trustee's compensation fee and $325 for personal attorney's fees. Although negotiations between counsel for the trust and counsel for Snow began in July or August of 1971, the dispute was not resolved, nor did Snow release the funds in the bank account, during 1971.

As of October 8, 1971, the balance in the pension trust (both insurance policies and the bank account) allocable to petitioner was $23,238. On October 8, 1971, Boit, Dalton & Church, Inc., insurance agents for the trust, distributed to each trust participant his respective life insurance policy or policies.[2] Petitioner elected to surrender his policy for its cash value of $5,171, which amount he received in November 1971. Petitioners reported this amount on their 1971 joint Federal income tax return as a long-term capital gain.

In January 1972 Snow relinquished his demands for trustee's fees and personal attorney's fees and released, to the new trustees, the funds in the trust bank account. The new trustees thereafter, on February 9, 1972, distributed to petitioner $18,067, which represented the balance standing in his account in the trust after distribution of the life insurance policy on October 8, 1971. Petitioners deducted from the sum received Lee Blyler's contributions to the trust of $3,568, and reported the remainder, $14,499, as long-term capital gain on their 1972 joint Federal income tax return.

The Commissioner determined that the distributions to petitioner by the trust in 1971 and 1972 did not qualify for capital gains treatment.[3]

---

[2] The stipulated facts state that the premiums on the policies were due prior to Oct. 30, 1971. If the premiums were not paid by that date, the policies would automatically lapse and be placed on a paid-up basis at a reduced amount of insurance.

[3] The Commissioner did not object to the manner in which petitioner recaptured his contributions to the trust, i.e., by deducting them from the cash distribution received in 1972. Cf. sec. 72(e)(1)(B) and 72(f). Nor did the Commissioner, by way of alternative contention, object to petitioners' failure to report as ordinary income that part of the total distributions which represented contributions by the company during the plan year beginning Oct. 1, 1970. See sec. 402(a)(5), as in effect in 1971 and 1972 and applicable to distributions made in 1971 and 1972.

The taxation of distributions by qualified pension trusts to participants and beneficiaries of such trusts is governed by section 402 of the Code.[4] In general, such distributions are taxed in accordance with the rules of section 72, relating to annuities. Sec. 402(a)(1), I.R.C. 1954. However, under circumstances specified by section 402(a)(2), a recipient may be entitled to treat such a distribution as a long-term capital gain.[5] In order to obtain capital gain treatment, two requirements must be met:

(1) The total amount "payable with respect to any employee" must be paid to the taxpayer-distributee "within 1 taxable year of the distributee"; and

(2) The distribution must be made "on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service."

Although respondent asserted at the hearing when the case was submitted that the distributions at issue herein failed to qualify under the second requirement because they were not made "on account of" petitioner's death or separation from service, neither party has directly argued the point.[6] Rather,

---

[4] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities). * * *

(2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *

[5] Sec. 402(a)(5), effective with respect to 1971 and 1972, limits such capital gain with respect to employer contributions during plan years beginning after Dec. 31, 1969. The parties have not addressed this issue. See n. 3 supra.

[6] We note that the trust was terminated 6 weeks prior to petitioner's discharge by the company, and also that petitioner was not entitled to any distributions from the trust merely because of his discharge, for the simple reason that he had not been a trust participant for the required minimum of 10 years at the time of his discharge in accordance with the provisions of sec. 7.04 and sec. 7.07 of the amended trust

the issue presented relates to the first requirement, namely, did petitioner receive the total distributions payable to him by the trust within a single taxable year?

The parties agree that petitioner actually received one distribution (the life insurance policy converted by petitioner into cash) in 1971, and a second distribution (cash) in 1972. The Government argues that this disposes of the issue, since the clear requirements of section 402(a)(2) are not met. Petitioner, however, contends that he would have received the entire amount in 1971 except for the allegedly unjustified acts of Herbert Snow, and that he therefore constructively received the entire distribution in 1971. Alternatively, petitioner argues that Snow's action caused the funds in the trust bank account not to be "payable" to petitioner in 1971, so that the distribution of the life insurance policy in 1971 qualifies for capital gains treatment as a distribution of everything then "payable" to petitioner. We hold for respondent on both phases of petitioner's argument.

1. In *Oliver G. Willits*, 50 T.C. 602, 612–613, we made the following general comment upon the concept of constructive receipt:

> The theory of constructive receipt is one of long standing, and regulations embodying that concept have had judicial approval as far back as *Loose* v. *United States*, 74 F.2d 147 (C.A. 8, 1934). Thus, although income is not actually reduced to a taxpayer's possession, it is treated as constructively received by him in the taxable year when it is set apart for him, or otherwise made available to him without substantial limitation or restriction. Stated differently, a "taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it." * * * [Citations omitted.]

Moreover, it is well established that the doctrine of constructive receipt applies to distributions from qualified pension plans, *Leavens v. Commissioner*, 467 F.2d 809, 813 (3d Cir.); *Joseph M. Sperzel*, 52 T.C. 320, 329–330, and petitioner is

---

agreement, *supra* at 879, 880. Moreover, the stipulation of the parties indicates that the pension trust was terminated "due to the decline in profits of Howe and French, Inc. and Landsverk Corp." There would thus appear to be substantial support for the conclusion that the distributions were not made "on account of" petitioner's separation from his employer's service. Cf. *E. N. Funkhouser*, 44 T.C. 178, 184–185, affirmed 375 F.2d 1, 6 (4th Cir.); *Marcia K. Sarmir*, 66 T.C. 82; *Estate of Robert A. Stefanowski*, 63 T.C. 386; *Estate of George E. Russell*, 47 T.C. 8. In view of our resolution of the issue presented by the parties, however, we need not rest our decision upon this ground.

entitled to make positive use of it to establish the year in which funds were received for tax purposes. *Ross v. Commissioner,* 169 F.2d 483 (1st Cir.). He has failed to demonstrate, however, that he received in 1971 "unfettered command" of the funds held in the trust bank account, without "substantial restrictions" on his enjoyment thereof. See *Corliss v. Bowers,* 281 U.S. 376, 378; *Leavens v. Commissioner, supra;* sec. 1.451–2(a), Income Tax Regs. Justified or not, the recalcitrance of Herbert Snow represented a substantial limitation upon petitioner's access to the funds in the trust bank account. Furthermore, petitioner was not entitled to have the funds paid over to him until the then trustees took effective action calling for the distribution, cf. *Commissioner v. Davis,* 132 F.2d 644, 645 (1st Cir.); *Aileen Cooper,* 34 T.C.M. 1134, 1137, 44 P-H Memo. T.C. par. 75, 263, and he has failed to establish that the trustees intended any such distribution during 1971 prior to the resolution of their dispute with Snow.[7] A decision of the trustees to delay distribution of part of the trust assets until a subsequent year, no matter how well justified on economic or other grounds, does not override the clear statutory mandate that a distributee is entitled to capital gains treatment if and only if he received his entire distribution within 1 taxable year. *Beecher v. United States,* 226 F.Supp. 547 (N.D. Ill.).

Petitioner relies primarily upon the decision of the Fifth Circuit in *United States v. Hancock Bank,* 400 F.2d 975 (5th Cir.). In that case, a testamentary trust was entitled to receive certain royalties from the Humble Oil Co. Humble did not contest its liability but since there was some question as to the rights of some of the beneficiaries inter sese which were then in litigation in the State courts, it credited the royalties to a suspense account pending the resolution of the matters in controversy in that litigation. In holding that the trust was entitled to treat the royalties as income in the years in which they were thus earned and placed in the suspense account, the Court of Appeals relied specifically upon the fact that the

---

[7] The record does not show the circumstances under which Snow "refused to release" the funds in the trust bank account. Petitioner has offered no evidence that the trustees officially directed Snow to release the funds or that the trustees directed Snow or anyone else to pay over the funds to participants and/or beneficiaries of the trust.

State court litigation involving the beneficiaries had no relevance whatever to the right of the trustee to obtain the royalties immediately upon their becoming payable. It stated (400 F.2d at 979):

Although Humble undoubtedly placed an obstacle in the trustee's path to receiving the funds by placing them in a suspense account, the obstacle was *wholly without legal basis.* Humble was at all times liable to the trustee for the royalties credited to the special account. See William Parris, 20 B.T.A. 320. Under such circumstances we cannot say the district court erred in finding this did not amount to a "substantial limitation or restriction" on the trustee's control of its receipt. [Emphasis supplied.]

Apparently, the court felt that since there was no basis whatever for failing to pay over the royalties to the trustee, a mere demand therefor by the trustee would have resulted in immediate payment in the circumstances.[8] We do not pause to consider whether we would have arrived at the same result on the facts as that reached by the District Court which was accepted by the Fifth Circuit, for the present case is clearly distinguishable. Unlike Humble, Snow was affirmatively refusing to release the funds on deposit while asserting an adverse claim, and, on the sparse record before us, we cannot say that his position was frivolous. True, the trust instrument did not provide for trustees' fees, nor was Snow's right to his claimed attorney's fees spelled out therein. Nevertheless, no Massachusetts cases or statutory provisions have been called to our attention that would render a claim to such fees wholly without merit, and indeed there are indications that the point was at least arguable.[9]

---

[8] The District Court's decision in *Hancock Bank v. United States,* 254 F.Supp. 206, 207 (S.D. Miss.) states: "It must be and is presumed under the facts and circumstances in this case that [the royalties] were unconditionally available to the taxpayer [from the suspense account] * * *. * * * no demand therefor was ever made or refused."

[9] Under Massachusetts law, trustees are normally entitled to compensation for services rendered to the trust. In the case of testamentary trusts, this right is established by statute, Mass. Gen. Laws ch. 206, sec. 16; see *Parker v. Hill,* 185 Mass. 14, 69 N.E. 336; *North Adams National Bank v. Curtiss,* 278 Mass. 471, 180 N.E. 217, but in the absence of trust provisions to the contrary, the right to compensation may exist for other trustees as well. *Wasserman v. Locatelli,* 343 Mass. 82, 175 N.E.2d 914; Restatement 2d Trusts, sec. 242, comment e; see *Bradbury v. Birchmore,* 117 Mass. 569. Moreover, there appears to have been a recognized 1-percent termination charge or fee "which by long established custom in Massachusetts is payable to trustees when they finally surrender and distribute the property in their hands." *Commissioner v. Davis,* 132 F.2d 644, 646 (1st Cir.). The stipulated materials disclose that the total amount in the trust at the time of termination was $97,081.04, so that Snow's claim of a $1,000 trustee's fee was roughly 1 percent of that amount, which simply

Contrary to petitioner's contention, we cannot find on this record that Snow's conditional refusal to release the funds in the bank account was wholly unjustified. We have dealt with this point because the Fifth Circuit relied upon it in *Hancock Bank,* and have concluded that the present case is distinguishable upon the record before us. But even in *Hancock Bank* it was assumed that the royalties there in question "were unconditionally available to the taxpayer." See n. 8 *supra.* And it is this latter consideration that is crucial in respect of the application of the doctrine of constructive receipt. We have no alternative but to conclude that since petitioner's share of the funds in the trust bank account was not "made available" to him during 1971, he has failed to satisfy the section 402(a)(2) requirement that the distribution of his entire interest in the trust be made "within 1 taxable year."

2. Petitioner makes an alternative contention that even if he is not entitled to capital gains treatment in respect of the 1972 payment of cash, he may nevertheless have the benefit of such treatment to the limited extent of the 1971 distribution relating to his life insurance policy. He argues that the term "total distributions payable" in section 402(a)(2) should be interpreted in such manner as to exclude the withheld funds in the bank account, with the consequence that the life insurance itself would constitute the "total distributions payable" and would qualify for capital gains treatment, since it was distributed in 1971, i.e., "within 1 taxable year." We hold that this position is untenable. The statute is clear upon its face. It refers to an "employee's trust" and provides for capital gains treatment "if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee." Plainly, both the life insurance distributed in 1971 and the cash payment made in 1972 were merely components of the "total distributions payable with respect to petitioner," and there is no basis in the statute for limiting that term to the first installment in this case.

---

had been rounded out. It would seem that Snow appeared to have had at least an arguable position in respect of the trustee's fee, and petitioner, upon whom the burden of proof rested, presented no evidence as to the nature of the attorney's fee for which Snow sought reimbursement.

Petitioner does not refer us to any legislative history or decided cases in support of his contention. He relies solely upon two rulings of the Commissioner which have attempted to relax the rigors of the statute in several specified situations. Rev. Rul. 67–164, 1967–1 C.B. 88; Rev. Rul. 69–190, 1969–1 C.B. 131. However, as we shall point out shortly, the present case is sharply distinguishable.

In Rev. Rul. 67–164, a trustee distributed to the beneficiaries of an exempt profit-sharing trust the entire amounts standing to their accounts on the date of distribution, less amounts impounded by court order pending disposition of litigation against the trust. The Commissioner ruled that the distributees were entitled to capital gains treatment under section 402(a)(2), notwithstanding the possibility of an additional distribution after release of the impounded funds. Similarly, in Rev. Rul. 69–190, the Commissioner ruled that subsequent distributions from a qualified trust, resulting from actuarial recalculations, did not cause prior distributions, thought at the time to represent the distributees' entire interest in the trust, to lose the right to capital gains treatment. (In both cases, the later distributions were taxed to the distributees as ordinary income.)

By analogy, petitioner reasons that funds in the trust bank account were not "payable" in 1971 because of Snow's intransigence, and argues that the 1971 distribution (the life insurance policy) therefore constituted the balance standing to petitioner's account and payable to him at the time of the distribution. We disagree. *It was at all times known that petitioner must eventually receive an additional and substantial cash distribution* from the trust. The record fails to show that the trust took any steps to segregate the disputed funds (e.g., by attempting to arrange with Snow the setting aside of $1,325 which he claimed) and distribute the remaining, undisputed funds to the distributees, despite the fact that the undisputed funds constituted the bulk of the trust bank account, greatly exceeding Snow's $1,325 claim. Plainly, even under the foregoing rulings, the amount payable in 1971 upon the termination of petitioner's employment included at least that portion of petitioner's share of the trust bank account funds which did not represent his pro rata share of Snow's claim for $1,325. Petitioner did not receive the entire amount

standing to his account in 1971, and is therefore not entitled to capital gains treatment for the amount he did receive in 1971.

*Decision will be entered for the respondent.*