JOHN A. GAMBLING and SALLY GAMBLING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gambling v. Commissioner
Docket No. 10777-78
United States Tax Court
T.C. Memo 1981-585; 1981 Tax Ct. Memo LEXIS 158; 42 T.C.M. (CCH) 1372; T.C.M. (RIA) 81585; October 7, 1981. Walter C. Cliff and George Wailand, for the petitioners. Lewis R. Mandel, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1973 in the amount of $ 50,508.17. The sole issue for decision is whether payments of deferred compensation in the amount of $ 70,777.52 constitute gross income to the petitioners in the taxable year 1973, the year in which petitioner John Gambling received such payments or whether they were constructively *159 received in 1965 through 1968 within the meaning of section 451. [1]
FINDING OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioners, John A. Gambling and Sally Gambling, are husband and wife. At the time of filing their petition in this case, they resided in Latingtown, New York. Petitioners have filed joint Federal income tax returns on a calendar year basis for each year since 1964 and have employed the cash receipts and disbursements method of accounting on each such return. They filed their United States income tax return for the taxable year 1973 with the Internal Revenue Service Center in Holtsville, New York. This action involves the petitioners' income tax liability for the calendar year 1973. The Commissioner of Internal Revenue mailed to the petitioners a notice of deficiency, dated June 23, 1978, which alleged a deficiency in the amount of $ 50,508.17. The only adjustment proposed by the notice of deficiency *160 which is in dispute is the proposed addition to the petitioners' 1973 gross income received by John A. Gambling (hereinafter "Gambling") of $ 70,777.52, from RKO General, Inc. (hereinafter "RKO"), a corporation organized under the laws of the state of Delaware. The 1963 Agreement
During the taxable years 1963 and 1964, Gambling was employed by the WOR Division of RKO as a radio announcer over Station WOR in New York, New York. Gambling performed this employment pursuant to a written contract entered into on January 1, 1963 between Gambling and RKO (hereinafter "the 1963 agreement"), the term of which was to run from January 1, 1963 to December 31, 1965. The 1963 agreement provided in paragraph 5 for deferred compensation for Gambling in the event that revenues from his radio program exceeded $ 125,000 per annum, which deferred compensation was to be set aside and paid to Gambling in accordance with paragraph 6 of the 1963 agreement. Under paragraph 6(a) of the 1963 agreement, payment of deferred compensation to Gambling at the rate of $ 2,000 per month was to commence in January 1985. However, under paragraph 6(b), in the event of discontinuance of employment of *161 Gambling by RKO upon the expiration or termination of the term of the 1963 agreement or any extension or renewal thereof prior to December 31, 1984, the $ 2,000 per month payments were to commence on the first day of the month following the discontinuance of employment. Specifically, paragraph 6(b) provides: (b) In the event of the death or permanent disability of the Artist prior to December 31, 1984, or in the event of the discontinuance of the employment of the Artist by RKO upon the expiration or termination of the term of this agreement or any extension or renewal thereof prior to December 31, 1984, the monthly payments provided in subparagraph "(a)" above shall be made commencing on the first day of the month following such death, permanent disability or discontinuance of employment; in all other respects such payments shall be paid in the manner and to the extent provided in subparagraph "(a)" above. The February 28, 1965 Letter Agreement
By a letter agreement of February 28, 1965 (hereinafter "the 1965 letter agreement") Gambling and RKO agreed to terminate the 1963 agreement in all respects except that subparagraphs 5(c) and (d) and all of paragraph 6 of the 1963 *162 agreement were to continue in full force and effect until the accounting and payments contemplated thereby were made. Each of these provisions related to Gambling's compensation for services already performed under the 1963 agreement by Gambling as of February 28, 1965. This compensation was based on RKO's revenues, which it had already earned by February 28, 1965. The 1965 Agreement
John A. Gambling Enterprises, Inc. (hereinafter "Enterprises") is a New York corporation which has elected Subchapter S statute under the applicable provisions of the Internal Revenue Code. Simultaneously with the execution of the 1965 letter agreement, Enterprises and RKO executed a written contract (hereinafter "the 1965 agreement") whereby Enterprises furnished RKO the services of Gambling, Enterprises' employee, for the period commencing March 1, 1965 and ending December 31, 1969. The 1965 letter agreement and the 1965 agreement were entered into by Gambling and RKO to accommodate Gambling's desire to change his form of doing business from an individual to a corporation. Although Enterprises was substituted in place of Gambling as a party to the 1965 agreement, Gambling's employment *163 was not discontinued and he continued to perform the same services for station WOR. The 1965 agreement left most of the provisions of the 1963 agreement intact but made some important changes in the rate of Gambling's current compensation and some other changes regarding program hours, vacation rights and prerecording rights. On February 28, 1965, and March 1, 1965, when Gambling and Enterprises entered into the 1965 letter agreement and the 1965 agreement with RKO, neither Gambling nor RKO believed that Gambling was entitled to any of the deferred compensation earned by him under the 1963 agreement until January, 1985. There was also no discussion between Gambling and RKO with respect to the timing of the payment of Gambling's deferred compensation at the time of the execution of the 1965 letter agreement and the 1965 agreement.
Gambling's Deferred Compensation
For the calendar years 1963, 1964 and the first two months of 1965, the amounts that RKO was required to accrue or set aside under the provisions of subparagraph 5(d) of the 1963 agreement were as follows: 1963
$ 19,740.34
1964
43,858.77
1965
7,178.41
$ 70,777.52
(These amounts shall hereinafter *164 be referred to as Gambling's "deferred compensation.") There was no discussion or any other communication or exchange between Gambling and RKO or Station WOR with respect to the payment of Gambling's deferred compensation between March 1, 1965 and the taxable year 1973. At no time prior to 1973 did RKO make any payment to Gambling out of Gambling's deferred compensation. RKO, an accrual basis taxpayer, accrued the amounts of Gambling's deferred compensation it was obliged to accrue or set aside under the 1963 agreement and the 1965 letter agreement and charged Gambling's deferred compensation to earnings in each period. It made the corresponding credit to a liability account labeled "Deferred Compensation--John A. Gambling." RKO did not at any time during the period commencing January 1, 1963 through January 1, 1973 fund an account for Gambling's deferred compensation in the name of Gambling, nor did RKO specifically set aside or segregate any funds for Gambling's deferred compensation during this period. RKO was able to pay Gambling's deferred compensation as and when such payment was due under the terms of the 1963 agreement and the 1965 letter agreement. RKO has in the *165 past refrained from advising persons to whom deferred compensation was due of the availability of the deferred compensation. Gambling's intentions to accelerate the payment of his deferred compensation did not materialize until such time in 1973 when he was advised by his new attorneys and accountants that the 1963 agreement might be construed to provide for payment prior to January, 1985. Gambling was not entitled to commence receiving his deferred compensation at the rate of $ 2,000 per month beginning on March 1, 1965 and did not have an unrestricted right to such payments before 1973. The 1973 Letter Agreement
In May of 1973, Gambling for the first time requested RKO to make a payment to him out of Gambling's deferred compensation. By letter dated May 14, 1973, Gambling requested the release of $ 23,000 of his deferred compensation. Mr. Elisha Goldfarb, an attorney for RKO, was requested by RKO to draft a letter with respect to the payment to Gambling of $ 23,000 of Gambling's deferred compensation. Said letter was dated May 16, 1973 (hereinafter "the 1973 letter agreement") and was duly executed by Herbert Mayes for RKO and by Gambling. The agreement provided *166 in part: At Artist's request, RKO is paying to Artist upon the signing of this letter agreement, from the sums accrued or set aside and held by RKO as provided in subparagraph (d) of paragraph 5 and in paragraph 6 of the 1963 Agreement as amended by the 1965 Amendment, the amount of Twenty-three Thousand Dollars ($ 23,000). As herein amended, the 1963 Agreement as amended by the 1965 Amendment shall continue in full force and effect. In connection with the execution of the 1973 letter agreement, RKO paid Gambling the $ 23,000 of Gambling's deferred compensation by its check dated May 18, 1973. In the normal course of its business practices, neither RKO nor Station WOR ever executed a separate writing to accompany its payment of deferred compensation.In response to Gambling's further oral request, RKO paid the remaining $ 47,777.52 balance of Gambling's deferred compensation on July 26, 1973. No further writings between the parties were executed in connection with this payment. Petitioners reported neither the actual nor constructive receipt of Gambling's deferred compensation in any manner on their United States Income Tax Returns prior to the taxable year 1973. While *167 petitioners disclosed the receipt in 1973 of Gambling's deferred compensation in their tax returns for that year, they did not include it in income. OPINION In 1963, Gambling and RKO entered into a contract for a term of 3 years, running from January 1, 1963 through December 31, 1965.The contract provided for possible deferred compensation to be paid to Gambling at the rate of $ 2,000 per month commencing on January 1, 1985, or the first day of the month following the discontinuance of petitioner's employment by RKO upon the termination of the terms of the 1963 agreement. By a letter agreement dated February 28, 1965, Gambling and RKO agreed to terminate the 1963 agreement in all respects except that the provisions relating to deferred compensation were to continue in full force and effect until the accounting and payments contemplated thereby were made. Simultaneous with the execution of the 1965 letter agreement, John A. Gambling Enterprises, Inc. entered into a written contract with RKO whereunder Enterprises furnished the services of Gambling, Enterprises' employee for the period commencing March 1, 1965 and ending December 31, 1969. In May 1973, in response to a request *168 by Gambling, RKO executed a letter agreement releasing to Gambling $ 23,000 of the deferred compensation accrued during the term of the 1963 agreement. Later in the taxable year 1973, RKO paid Gambling the remainder of his deferred compensation. The issue is whether these payments of deferred compensation in the amount of $ 70,777.52 constitute gross income to the petitioners in the taxable year 1973, the year in which Gambling received the payments of said compensation or whether the payments were constructively received by Gambling prior to 1973. Petitioners point to paragraph 6(b) of the 1963 agreement as establishing Gambling's right to receive the payments commencing in 1965. The contend that although paragraph 6(a) required RKO to pay Gambling his deferred compensation commencing on January 1, 1985, paragraph 6(b) stated that payment shall commence on the first day of the month following "the discontinuance of the employment of [Gambling] by RKO upon the expiration or termination of the term of [the 1963 agreement] or any extension or renewal thereof prior to December 31, 1984." Petitioners argue that since the term of the 1963 agreement was terminated and that Gambling's *169 employment by RKO was discontinued at the time of the execution of the 1965 agreement, Gambling was entitled to begin receiving his deferred compensation in 1965. Thus, petitioners contend that Gambling was in constructive receipt of all his deferred compensation of $ 70,777.52 in 1965 through 1968 despite having actually received such amounts in 1973. Respondent contends however that the 1965 agreements constituted an extension of the 1963 agreement, terminating all the provisions of the 1963 agreement except for paragraphs 5(c) and (d) and all of paragraph 6 which required RKO to commence paying Gambling his deferred compensation in January 1985. Thus, respondent argues that since the 1965 agreements were an extension of the 1963 agreement, the execution of the 1965 agreements did not trigger the accelerated payment provision of paragraph 6(b) of the 1963 agreement. Respondent further contends that the 1973 letter agreement constituted another amendment of the 1963 agreement, requiring RKO in 1973 to pay Gambling his deferred compensation which was otherwise to be paid beginning January 1, 1985.Respondent therefore contends that Gambling, a cash basis taxpayer, had neither *170 a contractual right nor an unrestricted right to receive his deferred compensation from RKO prior to the taxable year 1973. We agree with respondent that Gambling was not in constructive receipt of the funds prior to 1973. It is settled law that income which is subject to a taxpayer's unfettered command and that which he is free to enjoy at his own option is taxed to him as his income whether he sees fit to enjoy it or not. See Corliss v. Bowers, 281 U.S. 376 (1930); Loose v. United States, 74 F.2d 147, 150 (8th Cir. 1934); Romine v. Commissioner, 25 T.C. 859 (1956). The doctrine of constructive receipt is applied where a cash basis taxpayer is presently entitled to money which is made immediately available to him and his failure to receive it is due entirely to his own volition. In other words, "a taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it." Hamilton Naitonal Bank of Chattanooga, Administrator v. Commissioner, 29 B.T.A. 63, 67 (1933); Adams v. Commissioner,20 B.T.A. 243 (1930), *171 affd. 54 F.2d 228 (1st Cir. 1931). The doctrine of constructive receipt is developed by regulations under section 446(c) [2] which provide as follows: Generally, under the cash receipts and disbursements method * * * all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received. * * * Section 1.451-2(a), Income Tax Regs., which sets forth the general guidelines as to the constructive receipt of income, provides: Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is *172 subject to substantial limitations or restrictions. * * * The doctrine of constructive receipt, which is controlling in this case, is a doctrine of uniform application, binding on the Commissioner as well as taxpayers. Ross v. Commissioner, 169 F.2d 483, 492 (1st Cir. 1948). It could be asserted by a taxpayer as a defense to a deficiency assessment even though the item in controversy had not been reported for the taxable year of the alleged constructive receipt, and even though the statute of limitations barred assessment of a deficiency in tax for an earlier year. Ross v. Commissioner, supra.See generally 2 Mertens, Law of Federal Income Taxation, sec. 10.02, p. 6 (1974). Therefore, petitioners are not barred from asserting that they were in constructive receipt of the payment in 1965-1968 although assessment for those years is barred by the statute of limitations. Our analysis of the issue of constructive receipt in the instant case involes the discussion of two related questions: (1) did Gambling have a contractual right o receive in 1965 *173 the compensation which had been deferred under the 1963 agreement; and (2) even assuming that Gambling was entitled to such amounts, are the essential requirements of constructive receipt present in this case, i.e., an unrestricted right by the taxpayer to such amounts. These are questions of fact. Cozzens v. Commissioner, 19 T.C. 663 (1953). We find that Gambling possessed neither a contractual nor an unrestricted right to the deferred compensation payments until 1973, the year of actual receipt. The rule is well settled that when the terms of a written contract are unambiguous, the intent of the parties must be found therein. Nichols v. Nichols, 306 N.Y. 490, 496, 119 N.E. 2d 351, 353 (1954). A court may not, under the guise of interpretation, make a new contract for the parties or change the words of a written contract so as to make it express the real intention of the parties if to do so would contradict the clearly expressed language of the contract. Rodolitz v. Neptune Paper Products, Inc., 23 N.Y.2d 383, 386, 239 N.E. 2d 628, 630 (1968). *174 Paragraph 6(b) of the 1963 agreement provided early payments of Gambling's deferred compensation in the event of his death or disability. Additionally, early payment was provided when: (1) his employment with RKO was discontinued, and (2) the term or any extension or renewal of the 1963 agreement expired or terminated. [3] We believe this paragraph contemplates the complete cessation of services (directly or indirectly) by Gambling for RKO, either through death or disability, or through retirement or employment by another communications business. [4] We certainly do not believe that the parties intended to allow the accleration provisions of paragraph 6(b) to be triggered by the simple expedient of Gambling's incorporating himself although Gambling would continue to perform services identical to those he was performing when the parties entered into the 1963 agreement. [5] Our interpretation of the language of the contract--"Discontinuance of employment of the Artist by RKO"--simply does not encompass the circumstances before us. Therefore, even assuming that both the term of the 1963 agreement was terminated as a result of the termination language of the 1965 letter agreement *175 and the 1965 agreement did not constitute an "extension or renewal" of the 1963 agreement, the acceleration provisions of paragraph 6(b) were never triggered since Gambling's services were not discontinued. [6]
*176 Furthermore, the fact that both the 1965 and 1973 letter agreements specifically carried forward the provisions of the 1963 agreement relating to Gambling's deferred compensation demonstrates that the parties contemplated that Gambling would begin receiving the deferred compensation in January 1985. Therefore, under our interpretation of paragraph 6(b) of the 1963 contract, Gambling was not contractually entitled to the deferred compensation in 1965. He thus did not constructively receive such amounts commencing in 1965. Cf. Robinson v. Commissioner, 44 T.C. 20 (1965); Oates v. Commissioner, 18 T.C. 570 (1952). Assuming arguendo that Gambling was contractually entitled to the deferred compensation payments beginning in 1965, it is clear that his right to such amounts in that year was not unrestricted so as to invoke the doctrine of constructive receipt. In analyzing the issue of constructive receipt, the intent and belief of the parties as to their legal rights at the time of the execution of the 1965 and 1973 agreements are relevant in determining whether Gambling had an unrestricted right to his deferred compensation in 1965. *177 Before 1973, neither Gambling nor RKO ever believed that payments of the deferred compensation were to commence earlier than 1985. There were no discussions or any other communications or exchanges between RKO, WOR, Gambling and Enterprises with respect to the timing of the payment of Gambling's deferred compensation from the time of the execution of the 1965 letter agreement and the 1965 agreement until the taxable year 1973. The 1965 agreement was entered into by the parties to allow Gambling to change to the corporate form of doing business and did not purport to alter the timetable for payment of the compensation deferred under the 1963 agreement. [7] Rahter, at the time of the execution of the 1965 agreement, neither Gambling nor RKO was aware that the execution of such agreements might have also triggered Gambling's right to an accelerated payment under paragraph 6(b) of the 1963 agreement. This is also indicated by the language of the 1965 and the 1973 letter agreements. The 1965 letter agreement terminated the 1963 agreement "in all respects" except that it continued subparagraphs 5(c) and (d) and all of paragraph 6 of the 1963 agreement in "full force and effect." Furthermore, *178 the 1973 letter agreement provided that "the 1963 agreement as amended by the 1965 amendment shall continue in full force and effect." The language of both the 1965 and 1973 agreement demonstrates that RKO did not consider itself contractually obligated to commence paying Gambling his deferred compensation in 1965. Not until 1973, when Gambling's counsel construed the 1963 agreement to enable Gambling to obtain much needed cash from RKO was it thought that Gambling had a right to an accelerated payout by virtue of paragraph 6(b) of the 1963 agreement. Thus, in view of the confusion and ambiguities involved, it is specultive whether RKO would have made such payments in 1965. [8] Indeed, under such *179 circumstances, we cannot find that it would have been wholly unjustified in refusing to release such funds. See Blyler v. Commissioner, 67 T.C. 878 (1977); cf. United States v. Hancock Bank, 400 F.2d 975 (5th Cir. 1968). The case law on this point is instructive since we have encountered situations where the willingness of the payor to release funds is a crucial factor in determining whether the one receiving the money is in constructive receipt thereof. Wolder v. Commissioner, 493 F.2d 608 (2d Cir. 1974), cert. denied 419 U.S. 828 (1974); United States v. Hancock Bank, supra; Blyler v. Commissioner, supra.[9]
*180 In United States v. Hancock Bank, supra, a refusal by the payor to release funds without justification whatsoever did not preclude the application of the constructive receipt doctrine to the year of such refusal. In Hancock Bank, a testamentary trust was entitled to receive certain royalties from the Humble Oil Company in 1950 but Humble placed the royalties in a suspense account pending resolution of some matters in controversy between the trust beneficiaries. The Fifth Circuit held that the trust was in constructive receipt of such income, stating: Although Humble undoubtedly placed an obstacle in the trustee's path to receiving the funds by placing them in a suspense account, the obstacle was wholly without legal basis. Humble was at all times liable to the trustee for the royalties credited to the special account. See William Parris, 20 B.T.A. 320. Under such circumstances we cannot say the district court erred in finding this did not amount to a "substantial limitation or restriction" on the trustee's control of its receipt. [400 F.2d at 979. Emphasis added.] However, where the payor had some justification *181 in refusing to release the funds, we have held that the doctrine of constructive receipt was not applicable to the year of such refusal. Blyler v. Commissioner, supra. In Blyler, the taxpayer received a distribution of a life insurance policy from a pension plan trust in October, 1971. Because of the actions of one trustee, the cash asset of the trusts was blocked in a bank account between June, 1971 and January, 1972. In February, 1972, the taxpayer received a distribution of the cash, representing his entire remaining interest in the trust. We held that the doctrine of constructive receipt was inapplicable since the taxpayer failed to demonstrate that in 1971 he received "unfettered command" of the funds held in the trust bank account without "substantial restrictions" on his enjoyment thereof. The Court reasoned that "[j]ustified or not, the recalcitrance of [the trustee] represented a substantial limitation upon petitioner's access to the funds in the trust bank account." 67 T.C. at 885. The Court noted that the trustee's refusal to release the funds was not wholly unjustified, thus distinguishing Hancock Bank where the Court *182 found that the trust's refusal to release the royalties was wholly without legal basis. 67 T.C. at 887. The Court further distinguished Hancock Bank and concluded that the doctrine of constructive receipt was not applicable: But even in Hancock Bank it was assumed that the royalties there in question "were unconditionally available to the taxpayer." * * * And it is this latter consideration that is crucial in respect of the application of the doctrine of constructive receipt. We have no alternative but to conclude that since petitioner's share of the funds in the trust bank account was not "made available" to him during 1971, he has failed to satisfy the section 402(a)(2) requirement that the distribution of his entire interest in the trust be made "within 1 taxable year." [10] [67 T.C. at 887.] *183 The facts of Blyler are not squarely presented here since the trustee in Blyler "was affirmatively refusing to release the funds on deposit." 67 T.C. at 886. In the instant case, it is doubtful that RKO would have released the funds in 1965, especially since RKO did not believe it was obligated to do so at that time, and the governing contracts provided a very substantial basis for this belief. Under such circumstances, petitioners have a difficult burden in showing that Gambling's control was not subject to substantial restriction. See Rule 142, Tax Court Rules of Practice and Procedure. As the Third Circuit in Nitterhouse v. United States, 207 F.2d 618, 620 (3d Cir. 1953), stated: It is not enough that the taxpayer might have got [sic] the money in 1944 had he applied for it and made the requisite showing. He did not apply for it and no requisite showing by him was made. Therefore, he was not in a position to show that he was unqualifiedly entitled to the money. An essential requirement of constructive receipt is here missing, since the income was not "unqualifiably subject to the demand" of the cash basis taxpayer. Ross v. Commissioner, 169 F.2d 483, 490 (1st Cir. 1948). *184 Accordingly, we hold that the petitioner did not constructively receive the deferred compensation of $ 70,777.52 in 1965 through 1968. Thus, he must report it in his income for the taxable year 1973, the year he actually received it. Decision will be entered for the respondent. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue.↩
2. Sec. 1.446-1(c)(1)(i), Income Tax Regs.↩
3. The term of the 1963 agreement is defined in paragraph 1(d) of the 1963 agreement to be the period of 3 years commencing January 1, 1963 and ending December 31, 1965, I.e., the period over which Gambling was to render services to RKO. ↩
4. Although the parties stipulated that "[a]s of March 1, 1965, Gambling's employment by RKO was discontinued," we do not think that this constitutes a concession by the respondent that Gambling's services were discontinued within the meaning of paragraph 6(b) since, as we indicated above, discontinuance denotes a complete separation of service. This is especially so when read in l ight of the following sentence wherein the parties also stipulated that "[h]owever, by virtue of Gambling's employment by Enterprises and the 1965 agreement there was no interruption of Gambling's services to Station WOR." ↩
5. The testimony of Herbert Mayes, the comptroller of Station WOR was not helpful in determining whether Gambling was entitled to the compensation prior to 1985 since Mayes did not participate in the negotiation of any of the contracts and in fact admitted during trial that he lacked any personal knowledge as to Gambling's rights udner the contract. Thus, we need not consider petitioners' claim that Mayes' testimony should not be admissible under the parol evidence rule. ↩
6. Since the 1965 letter agreement by carrying forward the provisions of the 1963 agreement relating to deferred compensation did not completely terminate the 1963 agreement, it is doubtful that the term of the 1963 agreement was terminated.↩
7. Counsel for petitioners argued that RKO must have believed that Gambling was already entitled to the deferred compensation in 1973 since it is unlikely that it would pay Gambling his deferred compensation 12 years before it was due, thus giving up interest-free and pre-inflation use of over $ 70,000 for that period. However, RKO's accommodating Gambling's request does not appear irrational when considering the fact that Gambling's personal services were indispensable to WOR.↩
8. There is no evidence indicating that Gambling possessed any degree of ownership interest in RKO such that the withdrawal of the accrued amounts were within his control. Cf. Cooney v. Commissioner, 18 T.C. 883↩ (1952). 9. Where technical error or procedural foul-up by the taxpayer's employer delays taxpayer's receipt of wages, the doctrine of constructive receipt is inapplicable to the earlier year since the taxpayer does not have unrestricted control of his compensation prior to its actual receipt. Cf. Carter v. Commissioner, T.C. Memo. 1980-249 (procedural foul-up by the city of New York resulted in taxpayer receiving four weeks back pay in the next year); Gamble v. Commissioner, T.C. Memo. 1980-40↩ (technical error by the University of Florida in processing taxpayer's check delayed its receipt until the following year). An unrestricted right to such amounts rather than a mere entitlement thereto is necessary to satisfy the requirement of constructive receipt.
10. Where there was a finding that the payor was completely correct in retaining the funds, there certainly is no constructive receipt. Wolder v. Commissioner, 493 F.2d 608 (2d Cir. 1974), cert. denied 419 U.S. 829 (1974). In Wolder↩, we held that an attorney did not constructively receive compensation on his client's bequest of stock at the date of the client's death. The attorney asked for the stock on two occasions in 1965 but the co-executor denied his request and he did not receive the stock until early 1966 and the cash until much later. The court found that he did not have the stock readily available to him in 1965 since the co-executor exercised its rightful discretion in retaining possession of the stock. Thus, the stock value was not taxable until 1966, when it was actually received.